733 So.2d 1000 (1999)
David Paul SNIPES, Appellant,
v.
STATE of Florida, Appellee.
No. 90,413.
Supreme Court of Florida.
April 22, 1999.
*1001 James Marion Moorman, Public Defender, and Deborah K. Brueckheimer, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon David Paul Snipes for first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the conviction for first-degree murder, but we vacate the sentence of death and remand for the imposition of a life sentence.
The facts of this case are as follows. Snipes and John Saladino were charged with the first-degree murder of Markus Mueller. Saladino was allowed to plead guilty to second-degree murder, and he was sentenced to fifteen years in prison to be followed by ten years of probation. Snipes was tried and convicted based on *1002 the following evidence presented at trial. In February 1995, Markus Mueller was found dead in his home by his former girlfriend, Danielle Bieber. Mrs. Bieber called police when she found him. When police arrived, she was very upset and had to be asked to leave. She told police that her husband, David Bieber, "could have done this." David Bieber had followed Mrs. Bieber to Mueller's home in a separate vehicle but did not enter Mueller's home; police spoke briefly to him at the scene but did not arrest him.
Medical evidence reflected that Mueller had been shot three times; twice in the torso and once in the head. He died from the gunshot wound to the head. The bullets could have been fired from a .38 snubnose revolver. The murder weapon was not recovered.
For some time, Mr. Bieber was the main suspect. He had made numerous statements to others that he wanted Mueller dead and he had contacted Mueller on the night of the crime. There were two possible motives: steroid trafficking and jealously over Mrs. Bieber. Mrs. Bieber had married Mr. Bieber just four days before the crime. Apparently, before that marriage, Mrs. Bieber had been dating Mueller but had been seeing Mr. Bieber secretly while she was dating Mueller. Mr. Bieber disappeared some time after the murder and has not been found; there is an outstanding warrant for his arrest.
Subsequent to the murder, Michael Larson told police that he lived next door to David Snipes; that he and Snipes were friends; that Snipes had borrowed Larson's.38 pistol shortly before the murder; and that Snipes had never returned the gun. In February, Snipes' girlfriend also noticed that Snipes had extra money. Snipes told his girlfriend that he had been hired to shoot Mueller for $1,000. While Snipes was in jail awaiting trial, he also confessed to two of his uncles, telling one of them that Mr. Bieber had asked Saladino to find someone to commit the murder and that Saladino had then arranged for Snipes to commit the murder. Additionally, Snipes gave a taped confession to police.
Snipes was convicted as charged.
At the penalty phase proceeding, Mueller's father and sister testified briefly as to how Mueller's death had affected them. Snipes presented testimony from a clinical psychologist, who stated that Snipes functioned normally in many respects but was emotionally immature, was very insecure, and was somewhat inadequate in making social judgments. The psychologist testified that Snipes had a need to prove his masculinity; that Snipes had been involved with drugs and alcohol since the age of twelve or thirteen, including glue, gasoline, marijuana, and LSD; and that he was easily led by older individuals. He also stated that Snipes had a behavioral disorder and was suffering from the continuing mental duress of having experienced life in a dysfunctional family where he had poor role models and alcoholic parents and was sexually abused for some time by an uncle when he was very young (this oral sexual abuse occurred to both Snipes and his slightly older brother when Snipes was 3, 4, 5, and then again when he was around 7). He also stated that Snipes was a good candidate for rehabilitation.
A mitigation specialist noted that there were a number of family problems when Snipes was young such as family fights, a divorce, the mother's remarriage, alcoholism and drug abuse among family members, and sexual abuse. The specialist also stated that the uncle who sexually abused Snipes was allowed to move back into Snipes' father's home when Snipes was living with his father even though the family knew of the prior abuse. The specialist further noted stated that Snipes voluntarily got his GED in 1993 and that, while he was awaiting trial, his girlfriend bore his son and he then married her.
Other family members testified as to Snipes' good disposition, his drug use, the love he received from his parents, his capacity *1003 for rehabilitation, the lack of direction he received when growing up, the physical fights between his mother and father and between his mother and stepfather, and the fact that he has been a good father to the extent possible given that his child was born while he was in jail.
The jury recommended death by an eleven-to-one vote. The trial judge followed that recommendation. The trial judge found two aggravating circumstances: (1) the murder was committed for pecuniary gain; and (2) the murder was committed in a cold, calculated, and premeditated manner (CCP). The judge found one statutory mitigating circumstance: Snipes was seventeen when he committed the murder. He also found numerous nonstatutory mitigating circumstances to each of which he gave some, little, slight, or minimal weight (Snipes' parents were divorced when he was three; he has positive personality traits and rehabilitation potential; he obtained a GED on his own, has a sweet and loving character; he used drugs and alcohols at a very young age; Snipes had a difficult childhood, behaved at trial, and behaved during pretrial incarceration; he has a dysfunctional family; he voluntarily confessed to the crime and told others about it; he expressed remorse; the State depended on Snipes' statements to obtain a conviction; his statements assisted in obtaining an arrest warrant against a codefendant; he participated in a drug rehabilitation program; the person who hired Snipes to kill Mueller was older than Snipes; Snipes was not known, prior to this case, to be a violent person; he was a loving father; he has a personality disorder (impulsiveness and feeling of inadequacy); he has a behavioral disorder based on his dysfunctional family and lack of proper role models; he suffered childhood trauma; he did not flee the jurisdiction; he has some emotional disturbance, but not extreme; he has some impairment but not enough to rise to the level of a statutory mitigator; he is devoted religiously; and he suffers from stress). The judge also gave considerable weight to the fact that Snipes had been sexually abused as a young child and, although he found the sentence to be proportionate, he found that such a review was best left to this Court. He rejected the argument that Snipes' sentence was disproportionate when compared to the treatment afforded the codefendants. He noted that Snipes was the shooter, whereas Saladino was simply the go-between, and that Bieber had never been located. He also found no evidence to show that Snipes was under the influence of drugs or alcohol at the time of the crime.
In this appeal, Snipes raises six issues.[1] In his first issue, he asserts that the trial court erred in permitting the State to amend the indictment. The indictment in this case gave various spellings of the victim's name: "Markus Mueller a/k/a Markus Muller a/k/a Markus Muller a/k/a Kark Markus Muller." (Emphasis added.) The State asked the trial court to amend the indictment as to the victim's name in the fourth variation from "Kark" to "Karl." Snipes objected to the change on the ground that the victim's name is an essential element of the charge and because indictments cannot be amended. The trial court granted the State's motion and allowed the indictment to be amended.
Florida Rule of Criminal Procedure 3.140 governs indictments and informations. That rule provides as follows regarding the amendment of indictments and informations:

*1004 (c) Caption, Commencement, Date, and Personal Statistics.
(1) Caption. No formal caption is essential to the validity of an indictment or information on which the defendant is to be tried....
Any defect, error, or omission in a caption may be amended as of course, at any stage of the proceeding, whether before or after a plea to the merits, by court order.
. . . .
(i) Surplusage. An unnecessary allegation may be disregarded as surplusage and, on motion of the defendant, may be stricken from the pleading by the court.
(j) Amendment of Information. An information on which the defendant is to be tried that charges an offense may be amended on the motion of the prosecuting attorney or defendant at any time prior to trial because of formal defects.

(Emphasis added.) Under this rule, the caption of an indictment may be amended and unnecessary allegations may be stricken. The rule specifically provides for the amendment of an indictment's caption, for the striking of unnecessary allegations in either an information or an indictment, and for the amendment of an information. It does not provide for any other amendment of an indictment. As stated in the committee notes to the rule, subsection (j) as proposed contained no provision for the amendment of an indictment because (1) "presumably, a grand jury may not amend an indictment which it has returned and which is pending, although it may return another indictment and the first indictment may be disposed of by a nolle prosequi," and (2) a "federal indictment cannot be amended without reassembling the grand jury." The committee also stated that "[i]t may be that the Supreme Court of Florida will feel inclined to include in the rules an express statement concerning amendments of an indictment. None is included here, however." This Court has never included any other provision for amending an indictment, and we therefore conclude that the trial judge had no authority to issue an order amending the indictment. Accordingly, the order amending the indictment was a nullity.
Nevertheless, we conclude that the defect in the indictment in this case does not require a new trial. Subdivision (o) of rule 3.140 provides:
(o) Defects and Variances. No indictment or information, or any count thereof, shall be dismissed or judgment arrested, or new trial granted on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.

(Emphasis added.) Under this provision, we have stated that a material variance between the name alleged and that proved is fatal. Raulerson v. State, 358 So.2d 826 (Fla.1978). This is because the name of the victim as set forth in the indictment must be specific enough so as to not mislead the accused in the preparation of the defense or to subject the accused to a second prosecution for the same offense. Id. at 830. However, this Court has concluded that victims may be identified by their nicknames so long as the name used is sufficient to identify the victim beyond a reasonable doubt. Id.; see also Branch v. State, 94 Fla. 286, 115 So. 143 (1927) (identifying victim by nickname of "Harry" rather than given name of "Henry" not fatal to indictment where associates and others commonly referred to victim as "Harry").
Similarly, in Lackos v. State, 339 So.2d 217 (Fla.1976), this Court upheld the *1005 amendment of an information to change the name of the victim from "Remington Electric Razors, Inc." to "Remington Electric Shavers, a Division of Sperry Rand Corporation." Although that case involved the amendment of an information rather than an indictment, this Court relied on rule 3.140(o) to find that the defect was not fatal to the information because there had been no showing of prejudice to the accused. In reaching that decision, we quoted then Second District Court of Appeal Judge Grimes, stating: "The modern trend in both criminal and civil proceedings is to excuse technical defects which have no bearing upon the substantial rights of the parties. When procedural irregularities occur, the emphasis is on determining whether anyone was prejudiced by the departure." Id. at 219 (quoting Lackos v. State, 326 So.2d 220, 221 (Fla. 2d DCA 1976)).
In this case, the victim was identified by four different names in the indictment: "Markus Mueller a/k/a Markus Muller a/k/a Markus Muller a/k/a Kark Markus Muller." The victim was identified at trial as Karl Markus Mueller. While there may have been an issue regarding whether Snipes murdered Karl Markus Mueller, there was no issue regarding whether the victim in this case was in fact Karl Markus Mueller. Where Snipes was not prejudiced by the typographical error because it did not hamper the preparation of his defense or place him in jeopardy of being tried twice for the same offense, we conclude that this technical defect should be excused.
In issue two, Snipes contends that the trial court erred in denying Snipes' motion for mistrial after the jury heard that Snipes had been in jail before trial. During direct questioning of a witness, the State asked the witness the following question: "Now since [Snipes] has been in jail have you had conversations with him?" Snipes subsequently moved for a mistrial on the grounds that the State had wrongfully revealed to the jury that Snipes had been incarcerated prior to trial. The motion was denied but the court asked Snipes if he wanted a curative instruction. Snipes declined the curative instruction.
Snipes asserts that the motion should have been granted because his pretrial incarceration was not relevant to any issue and because this information undermined the presumption of innocence and raised an inference that he was especially dangerous or had committed other crimes.
A decision on a motion for a mistrial is within the discretion of the trial judge and such a motion should be granted only in the case of absolute necessity. Johnston v. State, 497 So.2d 863 (Fla.1986). In Ferguson v. State, 417 So.2d 639 (Fla. 1982), we specifically stated that when a brief reference is made to a defendant's previous incarceration, defense counsel should request a curative instruction because any prejudice arising from the admission of such testimony usually can be corrected by an instruction to the jury to disregard the testimony. See also Johnston.
In this case, the record reflects that the remark by the State was very brief and that no curative instruction was requested. Additionally, we conclude that a reasonable juror would know that Snipes had been in jail for at least some period of time prior to trial because he was charged with first-degree murder. Accordingly, we find this claim to be without merit.
Next, Snipes argues that the trial court erred in denying Snipes' motion to suppress his pretrial statements. The facts pertinent to this claim are as follows. On September 23, 1995, Snipes was taken from his home for questioning at 2:30 a.m. He and his mother were told that he was going to be interviewed about a neighbor. At the station, he was told he was going to be interrogated about the Mueller murder, he was given his Miranda rights, and he then gave a taped statement about the murder. Snipes testified that he asked for an attorney on three separate occasions *1006 prior to giving the taped statement. The deputies testified that he did not ask for an attorney. On the tape, Snipes was told he had the right to an attorney but he did not ask for one at that time. The deputies did not advise Snipes that he had the right to have his parents present.
Snipes concedes that the statutes do not require the presence of a juvenile's parent during questioning of the juvenile. He notes, however, that the lack of a parent's presence is one factor the court may consider in determining the voluntariness of a juvenile's confession. Snipes asserts that, under the circumstances of this case, his statements should not be considered voluntary because his mother was not present when he was questioned.
In Doerr v. State, 383 So.2d 905 (Fla. 1980), we concluded that the failure to notify a juvenile's parents prior to the juvenile being interrogated did not render the confession inadmissible per se. Rather, we concluded that such failure was but one factor to be considered in determining whether the confession was voluntary. We noted that the younger the juvenile, the more likely the confession would be found to be inadmissible. See also State v. S.L.W., 465 So.2d 1231 (Fla.1985) (under Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), totality of circumstances includes evaluation of juvenile's age, experience, education, background, and intelligence, and of whether juvenile has capacity to understand warnings given, nature of Fifth Amendment rights, and consequences of waiving those rights).[2]
In this case, Snipes' mother knew he was being taken to jail; Snipes was eighteen years of age when he was interrogated; Snipes had a GED; on the tape, he indicated that he understood his rights and he agreed to talk to the officers; the entire interview lasted for less than twenty minutes; he signed a written waiver form; and the officers testified that Snipes never asked to speak to an attorney. Based on these facts, we conclude that the trial court did not abuse its discretion in refusing to suppress Snipes' statements.
In his fourth claim, Snipes contends that the trial court erred in allowing the admission of statements made by Snipes to one of his uncles.[3] The record reflects that, while Snipes was in jail, he had several phone conversations with and wrote several letters to his uncle. Snipes apparently did not know that his uncle taped the phone conversations and was keeping the letters. Additionally, the uncle apparently had urged Snipes to talk to him under the premise of the uncle's needing the information to hire a private attorney. The uncle also told Snipes that he was destroying the letters.
According to Snipes, these statements were involuntarily given based on the coercive and deceptive tactics used by the uncle. Snipes moved to exclude these statements. The trial court denied the motion but found that the issue of coerciveness and involuntariness was an issue for the jury and he so instructed the jury.
In Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court held that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." The Court further concluded that even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does *1007 not make that evidence inadmissible under the Due Process Clause." Id. at 166. Since Connelly was issued, two Florida courts have addressed this issue.
First, in Howard v. State, 515 So.2d 430, 430 (Fla. 4th DCA 1987), the district court concluded that "involuntary confessions or admissions given to private persons are inadmissible in Florida courts." The Howard court relied on pre-Connelly Florida case law and did not discuss Connelly. The pre-Connelly Florida cases relied on in Howard were Lawton v. State, 152 Fla. 821, 13 So.2d 211 (1943); State v. Kettering, 483 So.2d 97 (Fla. 5th DCA 1986); and Peak v. State, 342 So.2d 98 (Fla. 3d DCA 1977). All three of those decisions were based at least in part on United States Supreme Court cases. Accordingly, Connelly effectively overruled those decisions.
More recently, the Fourth District Court of Appeal specifically rejected the Connelly analysis in Mirabal v. State, 698 So.2d 360 (Fla. 4th DCA 1997). Like the Howard court, the court in Mirabal relied on pre-Connelly cases. However, the district court also summarily concluded that Connelly was not applicable in Florida because the Connelly decision was based on the federal constitutional due process provision whereas the court in Mirabal based its decision on the Florida constitutional due process provision.
We conclude that we must reject the Mirabal court's conclusion because the reasoning of that decision is flawed. As in the Connelly case, the due process provision of the Florida Constitution requires state action before becoming applicable. See, e.g., In re Forfeiture of 1969 Piper Navajo, 592 So.2d 233 (Fla.1992) (main thrust of article I, sections 2, 9, and 23, Fla. Const., is that every person enjoys right to possess property free from unreasonable government intrusion); City of Miami v. St. Joe Paper Co., 364 So.2d 439 (Fla.1978) (in due process analysis, court must look to whether state action strikes a proper balance between individual's guaranteed rights and the welfare of the general public); Florida High School Activities Assn. v. Bradshaw, 369 So.2d 398 (Fla. 2d DCA 1979) (threshold question under article I, sections 2 and 9, is whether there is state action). Cf. Schreiner v. McKenzie Tank Lines, Inc., 432 So.2d 567 (Fla.1983) (state action required to invoke state equal protection provision).
Accordingly, because there was no police conduct causally related to the confession, we conclude that the trial judge acted appropriately in admitting Snipes' statements to his uncle but in instructing the jury to consider the coercive and involuntary nature of the statements when evaluating the credibility of those statements. We disapprove Mirabal and Howard to the extent they are inconsistent with this opinion.
In his fifth claim, Snipes asserts that a new trial is warranted because the State wrongfully introduced testimony that Snipes had no remorse and was a future danger to the community. We find this claim to be procedurally barred based on Snipes' untimely objection to the comment. See Norton v. State, 709 So.2d 87, 94 (Fla. 1997) (lack of objection at time of improper comment barred appellate review despite motion for mistrial at close of witness's testimony).
In his final claim, Snipes contends that the death penalty was unwarranted in this case. We agree. A proportionality review involves consideration of the totality of the circumstances of a case and comparison of that case with other death penalty cases. Urbin v. State, 714 So.2d 411 (Fla.1998). When we compare the totality of the circumstances of this case to other similar cases, we conclude that a sentence of death is inappropriate.
There are two aggravating circumstances in this case: that the murder was cold, calculated, and premeditated without pretense of legal or moral justification and that the murder was committed for pecuniary *1008 gain. However, there is substantial mitigation. Snipes was only seventeen at the time he committed the murder. He was sexually abused for a number of years as a child, he abused drugs and alcohol beginning at a young age, and he had no prior violent history. He was raised in a dysfunctional, alcoholic family, suffered childhood trauma, and has many positive personality traits (he has rehabilitation potential, obtained a GED on his own, has a sweet and loving character, and participated in a drug rehabilitation program). He also suffers emotional stress and a personality disorder due to his early childhood. Importantly, Snipes voluntarily confessed to the crime and told others about it, he expressed remorse, and the State depended on Snipes' statements to obtain a conviction against him and a warrant against a codefendant. Additionally, the crime was arranged by older individuals, and testimony reflected that Snipes was easily led by older persons.
Given these circumstances, we find this case to be closer to those cases in which we have reversed the death penalty for the imposition of a life sentence. For example, in Urbin, there were two valid aggravating circumstances (prior violent felony and pecuniary gain), and there were a number of mitigating circumstances (age of seventeen, substantial impairment, drug and alcohol abuse, dyslexia, employment history, and lack of a father). We found in Urbin that the defendant's age of seventeen was particularly compelling when coupled with the substantial impairment and family neglect. As in Urbin, here we find Snipes' age of seventeen to be particularly compelling when coupled with the history of sex and drug abuse and the other mitigating circumstances. See also Livingston v. State, 565 So.2d 1288 (Fla.1988) (defendant's youth, inexperience, and immaturity in addition to limited intellectual functioning and extensive use of cocaine and marijuana countered against two aggravating circumstances of prior violent felony and commission during robbery, warranting life sentence).
We disagree with the State's contention that this case is closer to Bonifay v. State, 680 So.2d 413 (Fla.1996), than Urbin and Livingston. Bonifay and the instant case both involved seventeen-year-olds who killed for money. However, the mitigation in Bonifay is not nearly as great as the mitigation here,[4] and there were three, rather than two, factors in aggravation in Bonifay.[5] Additionally, the defendant in Bonifay had admitted involvement in several prior crimes, one of which was a prior burglary in which someone was stabbed several months prior to the murder. Further, not only was the defendant in Bonifay hired to commit the murder; when the murder actually occurred, Bonifay callously killed the wrong person. The facts of that case indicated that the defendant broke into the store where the murder occurred and, after he did so, the victim was lying on the floor begging for his life and talking about his wife and children. The defendant told him to shut up and shot him twice in the head. In this case, although Snipes agreed to kill the victim for money, the murder occurred quickly and was not committed during a robbery, and Snipes had no history of violence. Additionally, as noted above, he was easily led by others and there was significantly more mitigation in this case than in Bonifay. Under a totality of the circumstances analysis, we find this case to be more akin to those cases in which we have determined *1009 that the youth and traumatic background of a defendant warrant a sentence of life imprisonment rather than death.
Accordingly, we affirm Snipes' conviction of first-degree murder, but we vacate the sentence of death and remand this case for the imposition of a life sentence without possibility of parole.
It is so ordered.
HARDING, C.J., SHAW and LEWIS, JJ., and OVERTON, Senior Justice, concur.
ANSTEAD, J., concurs specially with an opinion, in which SHAW and PARIENTE, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
PARIENTE, J., concurs in result only.
ANSTEAD, J., specially concurring.
Although I concur in the conclusion of the majority, I write to express my disagreement on one issue and to provide some additional observations on another.
While I concur in the majority's conclusion that the trial court did not err in admitting evidence of statements made by Snipes to his uncle, I would not go as far as the majority in ruling out challenges made to statements based upon the coercion of someone other than a state official. For example, the integrity of the judicial process may be at stake in a case involving an actually coerced statement. Courts should not condone the use of coercion to obtain a statement by admitting the product of such coercion into evidence. If someone puts a gun to the head of a suspect and thereby obtains an admission of guilt, courts should reject the use of such an admission regardless of who applied the force to obtain the admission. In other words, courts should not be a party to or sanction such conduct by allowing its product to be used in court proceedings. Cf. Howard v. State, 515 So.2d 430 (Fla. 4th DCA 1987). The majority goes too far in today's opinion.
While I also concur in the majority's resolution of the issue of proportionality, I note two other factors that support the majority's outcome. One is that the apparent two aggravating factors of CCP and pecuniary gain arose out of the same identical circumstances: that the defendant was hired to kill the victim. Hence, these aggravators should be merged and considered as one. Cf. Downs v. State, 572 So.2d 895 (Fla.1990) (trial court merged aggravators of CCP and pecuniary gain in killing-for-hire case). In addition, it is apparent by the record here that the two responsible and more culpable adults involved in the murder, who searched for a young person like defendant to do the actual killing, have gotten off considerably lighter.
SHAW and PARIENTE, JJ., concur.
WELLS, J., concurring in part and dissenting in part.
I concur with the majority decision and opinion as to the guilt phase of this trial.
I dissent as to the majority's decision as to proportionality and reduction of the death sentence to life. Having read the trial transcript of this trial, my first comment is to applaud the work of the trial judge in presiding over this trial.
Page after page of day after day of the trial transcript demonstrates the wide latitude, especially in the penalty phase, that the trial judge gave to the defendant to present his evidence to the jury and to the court. Following this presentation of evidence, the jury returned a recommendation of death by a vote of eleven to one. This Court has long stressed that a jury's recommendation is to be afforded great weight by the trial judge. Tedder v. State, 322 So.2d 908 (Fla.1975).
One month after the jury's recommendation, the trial court, following this Court's decision in Spencer v. State, 615 So.2d 688 (Fla.1993), held a hearing in which the *1010 defense was again given wide latitude in presenting any mitigation the defense wished to present. The trial judge stated that if the defendant wished to present testimony from 100 witnesses, he was there to consider that testimony. The defendant presented additional evidence at that hearing from family members and friends. The trial court considered an extensive letter written by the defendant. The hearing was adjourned.
The trial judge considered the sentence as this Court has instructed. Approximately one month later, the trial judge held a sentencing hearing and read a sentencing order which did precisely what this Court has instructed in Campbell v. State, 571 So.2d 415 (Fla.1990).
The trial judge's sentencing order considered and weighed in detail precisely the matters upon which the majority now rests it proportionality decision. In respect to age, the trial judge's sentencing order states:
The age of the Defendant at the time of the crime was seventeen years. The date of the crime was February 9, 1995. The Defendant's date of birth is June 17, 1977. This court acknowledges that at the time the Defendant committed the crime that he was under the age of majority. The law has long recognized and distinguished minors from adults. In this case, however, the Defendant was living independent from his parents. The Defendant obtained a GED. He began working. The Defendant at the time of the crime had conceived a child. The Defendant's own expert, psychologist Sidney Merin, testified that the Defendant was of normal or average intelligence. There is no evidence to show that the Defendant was developmentally or intellectually immature. This court further finds that the very nature of this crime, as well as the manner in which the contract murder was carried out, reveals that the Defendant's maturity level was higher than that of an ordinary teenager. The contract killing was performed in a professional manner. The Defendant commented to his uncle that the murder was performed in a clean manner such that he had left no finger prints nor physical evidence. The Defendant planned, prepared and shot the victim in a manner consistent with a sophisticated mature adult. Because the Defendant was living on his own, began working, obtained his GED, conceived a child, the manner in which this crime was committed, and the testimony concerning his intelligence, David Snipes, although seventeen years old at the time of the killing, was mentally and emotionally mature and exhibited unusual maturity for his age. This court finds this mitigating circumstance to exist and accords this factor considerable weight.
In respect to sexual abuse, the trial judge's sentencing order states:
Evidence was presented that the Defendant was sexually abused by an uncle. This testimony was presented through the Defendant's psychological expert, family members, as well as the mitigation specialist. The court will not minimize the sexual abuse committed upon the Defendant, however, the court does not find that at the time of the killing that the sexual abuse by his uncle was a factor. The crime was committed because the Defendant consciously made a choice to receive $1,000.00 for killing another human being. The abuse of his uncle did not enter into that equation. The court finds this mitigator was established and gives this mitigator considerable weight.
In respect to his abuse of drugs and alcohol, the trial judge's sentencing order states:
Testimony was presented that the Defendant started to use drugs and alcohol beginning at the age of twelve or thirteen. This evidence was presented by the Defendant through Dr. Merin. At various times in his life, the Defendant has experimented with glue, gasoline, marijuana, and LSD. However, as previously *1011 noted, there is no evidence that at the time of the crime that the Defendant had used or been under the influence of any alcohol or drugs. The court does not find that his drug problem contributed to or was a factor in the killing. The court finds this mitigator to exist, but gives it slight weight.
In respect to the defendant being raised in a dysfunctional family, the trial judge's sentencing order states:
Evidence was presented as previously noted that the Defendant's biological parents divorced at an early age. Testimony was presented that his biological parents drank and that other family members were alcoholics. There was also marijuana use prevalent in the family. However, the testimony established that the Defendant received a great deal of love. He was also provided with shelter, food and clothing. After his natural parents divorced, the Defendant became a step-son to a step-father who was described as being a good step-father. The Defendant was involved in activities such as little league and football. The family also received counseling. Evidently there was violence in the presence of the Defendant in a family setting. Furthermore, the Defendant was sexually abused by his uncle. While the evidence established that the Defendant had a difficult childhood, there are also many positive attributes to the family. As previously mentioned, there was a great deal of love and affection. This mitigating circumstance exists. This court has given this factor moderate weight in consideration of the Defendant's sentence.
I will not recite more of the sentencing order; suffice it to point out that the order is equally detailed and well-reasoned in respect to all points raised in mitigation.
I do not agree that the majority's setting aside of this defendant's death sentence on the basis of proportionality is based on the decisions the majority opinion cites or this Court's other precedent. This case is simply not similar to Urbin v. State, 714 So.2d 411 (Fla.1998). In Urbin, the majority specifically concluded that "this factual situation more closely resembles the fatal confrontation in Cook v. State, 542 So.2d 964, 970 (Fla.1989), wherein we found that the facts indicated that the defendant `shot instinctively, not with a calculated plan to eliminate [the victim] as a witness.'" 714 So.2d at 416. In this case, there is simply proof beyond every doubt that this defendant murdered this victim cooly and with heightened premeditation. In Urbin, the defendant's mother was incarcerated for drug abuse, and the defendant lived alone during much of his teenage years. In Urbin, there was evidence that Urbin was addicted to LSD and powder cocaine, and the majority opinion says that an expert testified that Urbin's use of alcohol and drugs would have impaired Urbin's thought processes on the night of the murder. The mitigation in the present defendant's case, while clearly demonstrating that defendant was raised in a dysfunctional family and was sexually abused, was appropriately considered and weighed by the trial judge and is simply not as extensive as in Urbin. The aggravators were appropriately given much more weight in the present case than in Urbin.
This case is likewise not similar to Livingston v. State, 565 So.2d 1288 (Fla.1988). In Livingston, this Court specifically found that Livingston had been severely beaten by his mother's boyfriend to the point where Livingston's intellectual functioning "can best be described as marginal." Id. at 1292. This Court found that these circumstances together with evidence of Livingston's extensive use of cocaine and marijuana counterbalanced the effect of the factors found in aggravation. The aggravators in Livingston were not as weighty as the CCP in this case.
On the other hand, this case is similar to Bonifay v. State, 626 So.2d 1310 (Fla. 1993); 680 So.2d 413 (Fla.1996). Bonifay was also seventeen at the time of the *1012 murder and agreed to commit the murder on agreement for money with a person who was nineteen. In Bonifay, as in the present case, the psychologist who interviewed Bonifay on behalf of the defense testified that the defendant was of average intelligence but had demonstrated dysfunctional traits as he was growing up. This case is also similar to LeCroy v. State, 533 So.2d 750 (Fla.1988), in which this Court specifically upheld that death penalty for a defendant who was seventeen years old when he committed premeditated murder. As late as December 24, 1998, this Court reaffirmed its decision in LeCroy. LeCroy v. Dugger, 727 So.2d 236, 24 Fla. L. Weekly S13 (Fla.1998).
NOTES
[1] Snipes asserts that (1) the trial court erred in permitting the State to amend the indictment; (2) the trial court erred in denying Snipes' motion for mistrial after the jury heard that Snipes had been in jail before trial; (3) the trial court erred in denying Snipes' motion to suppress his pretrial statements; (4) the trial court erred in allowing admission of statements made by Snipes to his uncle; (5) a new trial is warranted based on the State's introduction of testimony that Snipes had no remorse and was a future danger to the community; and the death sentence is disproportionate.
[2] Snipes also argues that Doerr is inconsistent with our decision in Allen v. State, 636 So.2d 494 (Fla.1994). In Allen, this Court stated that all questioning should cease when parents ask to see their child. In Allen, we specifically distinguished Doerr, noting that the failure of police to notify parents of the questioning does not automatically invalidate the confession. Moreover, here. Snipes' mother knew he was being taken to the station for questioning.
[3] This was not the uncle accused of sexually abusing Snipes.
[4] The defendant in Bonifay reportedly had organic brain damage related to attention deficit disorder. However, another psychologist in that case testified that the defendant had fairly good insight and judgment. He also had a "less-than-ideal family background," had a potential for rehabilitation, and was cooperative and remorseful.
[5] The aggravating circumstances were commission for pecuniary gain, commission during a robbery, and CCP. The pecuniary gain and robbery aggravators were considered as separate aggravators in Bonifay because the defendant was paid to commit the murder and also robbed the store where the murdered was committed.