797 So.2d 573 (2001)
Sonny Ray JEFFRIES, Appellant,
v.
STATE of Florida, Appellee.
No. SC94994.
Supreme Court of Florida.
August 23, 2001.
Rehearing Denied October 9, 2001.
*575 James B. Gibson, Public Defender, and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, Judy Taylor Rush and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, FL, Curtis M. French, Assistant Attorney General, Tallahassee, FL, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Sonny Ray Jeffries. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons stated below, we affirm the convictions and sentences, including the sentence of death.
The record establishes the following facts. Appellant and Harry Thomas were accused of murdering Wilma Martin, an Orlando woman in her late sixties. Martin worked as a property manager and her responsibilities included collecting the monthly rent. In the course of carrying out these responsibilities, Martin established a landlord-tenant relationship with Kevin Jeffries, Appellant's brother. Roxanne Jeffries and Tammy Avant, Appellant's sisters, also lived in central Florida.
In the summer of 1993, Appellant moved to Florida from New Jersey. He originally stayed with Tammy, but he also spent time with Roxanne and her live-in boyfriend Dennis Thomas. As a result of the time that he spent with Dennis Thomas, Appellant met Dennis's brother Harry Thomas. And at some point in time, Appellant became familiar with Martin through conversations with his brother Kevin.
On August 20, 1993, Martin's body was found in her home. She had been stabbed several times and kicked or stomped to death. She also had defensive wounds. The medical examiner testified that multiple blunt and sharp force injuries were the cause of death. A bloody footprint was left at the scene of the crime and a fingerprint was also discovered. Several pieces of jewelry were taken from Martin's house. The parties stipulated that Appellant pawned several pieces of Martin's jewelry within days of the murder.
Roxanne testified that in August of 1993, she overheard Appellant tell Harry Thomas that they should go out and rob and kill somebody. She testified that immediately after she overheard this, Harry Thomas and Appellant went out together. They told Roxanne that they were going to Disney World. A few days later, Roxanne noticed that Appellant had some rings in his possession that he did not have prior to the his recent outing with Harry Thomas. Tammy also testified that after Martin was killed, she remembered seeing Appellant with certain rings that he did not have before the murder.
Dennis Thomas testified that he overheard Harry Thomas and Appellant talking about robbing Martin. He overheard *576 the two talking about the fact that she would be a good target because she collected rent money on Fridays.
An expert laboratory analyst testified that he compared the shoe print left at the crime scene to the shoes that Appellant was wearing when he was arrested. The expert testified that the shoe print was left by the same type of shoes as Appellant's, but he was not able to conclusively determine that the shoe print was made by Appellant's shoes. He stated that because Appellant was not apprehended for a number of days after the crime, the tread on his shoes may have worn down, thereby making a conclusive identification impossible. Finally, an expert crime scene analyst testified that the fingerprint left at the crime scene matched Appellant's fingerprint.
The defense did not present any evidence at trial. The jury ultimately found Appellant guilty of first-degree murder and armed robbery with a deadly weapon.
At the conclusion of the guilt phase, Appellant discharged counsel and requested permission to represent himself during the penalty phase. After conducting a Faretta[1] hearing, the trial court granted this request. During the penalty phase, the State did not present any witnesses, only written victim-impact statements. Appellant presented the testimony of a number of mental health experts. Dr. Gutman concluded that Appellant lacked the appreciation and capacity to conform his behavior to the requirements of the law. Dr. Gutman also stated that Appellant is a paranoid schizophrenic, but Dr. Gutman added that Appellant knew right from wrong on the date of the crime. Dr. Ming testified that Appellant suffers from paranoia and schizophrenia. Dr. Fisher testified that Appellant suffers from schizophrenia. A certified copy of Harry Thomas's judgment and sentence was also introduced, which demonstrated that Thomas reached a plea agreement with the State whereby Thomas was convicted of second-degree murder for his involvement in this case and sentenced to twenty years' imprisonment.
The jury recommended death by an eleven to one vote. Pursuant to Appellant's request, defense counsel was reinstated for the remainder of the penalty phase. During the Spencer[2] hearing, Appellant offered mitigation regarding his alleged venereal disease.
The trial court ultimately sentenced Appellant to death for the first-degree murder conviction. In its order, the trial court found the following two aggravators: (1) that the murder was committed by a person engaged in the commission of a robbery and (2) the murder was especially heinous, atrocious, and cruel (HAC). The trial court found the following mitigators: (1) defendant's capacity to appreciate the criminality of his conduct was impaired; (2) codefendant Harry Thomas, who was equally culpable, pled to second-degree murder and was sentenced to twenty years; (3) the defendant has a long history of emotional and mental problems; (4) the defendant has a long history of drug and alcohol abuse; (5) the defendant has attempted suicide; and (6) the State offered the defendant a plea of life in prison. The trial court sentenced Appellant to a departure sentence of life imprisonment for the armed robbery conviction.
Appellant raises five issues in this appeal.[3] We begin with the guilt-phase issues. *577 First, Appellant claims that the trial court erred in denying his motion to suppress his shoes.
Prior to trial, Appellant moved to suppress the shoes that were taken from him when he was arrested in Georgia approximately three weeks after the crime in this case. At the beginning of the suppression hearing, the State stipulated that Appellant's arrest and detention were illegal. Appellant was arrested in Richmond Hill, Georgia, shortly after midnight on September 10, 1993. Richmond Hill is located along route Interstate 95. Appellant was traveling in a car with Harry Thomas. Thomas was wanted on a Florida arrest warrant for a separate robbery and a be-on-the-look-out had been posted for Thomas from Florida to New Jersey. After being apprehended, both Thomas and Appellant were placed in custody, taken to the police station, and placed in a cell. Appellant was not allowed to enter the cell with shoe laces, so his shoes were removed and placed in a locker. The shoes were eventually seized by the Orlando police. The shoes allegedly matched or were similar to prints that were left at the Martin murder scene.
The only witness who testified at the suppression hearing was Orlando detective Barbara Bergin. Bergin stated that she received a call around 1:30 a.m. on September 10 informing her that Henry Thomas had been stopped in Georgia and a person matching the description of the suspected murderer of Wilma Martin was with Thomas. She stated that on September 9, she had been gathering evidence that implicated Appellant in Martin's murder. Based on the evidence she gathered, she was preparing to obtain an arrest warrant for Appellant on September 10. She received the call that Appellant had been apprehended in Georgia on the morning of the day when she was going to write the warrant. Bergin testified that before receiving the call, she had planned to obtain the warrant, putting Appellant in the NCIC system, and advising agencies that she expected that Appellant would be traveling from Florida to New Jersey, where Appellant had relatives. Bergin had been in contact with Appellant's relatives in New Jersey, as well as the police in New Jersey. She also stated that upon finding Appellant, she intended to obtain the shoes he was wearing to see if they matched the print left at the murder scene.
After receiving the call from the Georgia police, Bergin obtained an arrest warrant on the afternoon of September 10. A search warrant for Appellant's personal property, including his shoes, was also obtained.
In its argument to the trial court, the State argued that the shoes in question would have inevitably been discovered. The trial court agreed and denied the motion to suppress. Appellant claims that the trial court's ruling was in error. We agree.
In Craig v. State, 510 So.2d 857, 862-63 (Fla.1987), this Court provided the following analysis of the inevitable discovery rule:
The evidence presented at the suppression hearing in this case was sufficient to establish by a preponderance of the evidence that, if appellant had not led police to the bodies, they would ultimately have been located very soon thereafter by means of ordinary and routine investigative procedures. There was testimony that the surrounding areas *578 of all sinkholes in the region would have been closely examined as a matter of routine. Also, co-defendant Schmidt had given his lawyer a limited authorization to inform the police that the bodies had been disposed of in deep water. This routine examination of sinkholes would have revealed the drag marks, debris, clothing fibers, and other indicators that were present at Wall Sink where the bodies were found. Wall Sink was the largest and deepest sink in the general area. These indicators, the testimony showed, would inevitably have caused police to concentrate their deep-water searching capabilities at Wall Sink. We therefore conclude that the trial court was correct in admitting the bodies and related evidence, on the ground that although they were in fact found by means of appellant's statements, they would have been found independently even without the statements, by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure. United States v. Satterfield, 743 F.2d 827 (11th Cir.1984), cert. denied, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985); United States v. Brookins, 614 F.2d 1037 (5th Cir.1980). The inevitable discovery doctrine is properly applied regardless of whether the ground of suppression of the statement is violation of the fourth amendment, fifth amendment, or sixth amendment. See Nix v. Williams, [467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ].
Additionally, in State v. Ruiz, 502 So.2d 87, 87 (Fla. 4th DCA 1987), the district court stated:
"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered ... then the evidence should be received." Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In order to apply this doctrine, there does not have to be an absolute certainty of discovery, but rather, just a reasonable probability. United States v. Brookins, 614 F.2d 1037 (5th Cir.1980).
Based on the circumstances of this case, we are unable to find that the State established by a preponderance of the evidence that Appellant's shoes would have inevitably been discovered. The State is asking this Court to conclude that had Appellant not been detained by the Richmond Hill police, he would have been detained shortly thereafter, based on the arrest warrant that Detective Bergin was preparing to obtain. There is nothing in the record upon which we can base such a conclusion. When asked why she thought Appellant would be traveling to New Jersey, Detective Bergin stated:
We did the Eastern Coast due to the fact they had family in New Jersey. I had already been there and met family members, interviewed witnesses there. Just assuming they were traveling north to an area where there was people where they would feel comfortable.
However, there is no evidence or indication that Appellant was heading to New Jersey as opposed to some other location. Mere assumptions are not enough to meet the reasonable probability standard set forth in Brookins. Consequently, because the State failed to meet its burden of establishing that Appellant would have been located again after a valid arrest warrant was issued, we hold that the trial court erred in denying the motion to suppress.
Nevertheless, we find this error to be harmless. In addition to the evidence regarding the shoe print, the State presented the following evidence: the testimony of Appellant's siblings regarding Appellant's *579 plan to rob and murder Martin, expert testimony linking Appellant to a fingerprint found at the murder scene, and a stipulation from both parties that Appellant pawned Martin's jewelry shortly after the murder. Moreover, the testimony concerning the shoes was not conclusive. Although the expert testified that the shoe print at the murder scene was left by the same type of shoes as Appellant's, the expert was not able to conclude that the shoe print was made by Appellant's shoes. For these reasons, we are convinced beyond a reasonable doubt that the error in admitting the shoes did not contribute to the verdict. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
In his second claim, Appellant argues that the trial court erred in overruling his objection to the State's use of a peremptory challenge to an African American juror. Both parties agreed before trial that individual voir dire of every juror was unnecessary; jurors would only be individually questioned if one of the parties felt that it was needed. Neither party requested to individually question juror Melvin. During jury selection, the State used a peremptory challenge to strike Melvin:
MR. ASHTON [prosecutor]: We would strike Juror Margie Melvin.
THE COURT: State strikes number 44.
MS. MARQUES [defense counsel]: Ms. Melvin is an African American. I would ask the State [to] explain the reason why they're striking her.
MR. ASHTON: I don't agree. I don't know that she is or not. Court make any observation?
MS. MARQUES: She is.
MR. ASHTON: The point of a Neil Challenge is the defense has to make sure the record reflects that. I'm indicating I honestly don't know if she is African American or not. If the court made that observation, fine.
MS. MARQUES: Juror questionnaire reflects it.
MR. BLANKNER [defense counsel]: Yes.
THE COURT: Yes. Question is obviously a Neil inquiry as to race neutral reason.
MR. ASHTON: Yes, your Honor. The answers to Questions 19, 20 and 21 are equivocal on the death penalty. That's my race neutral reason.
MS. MARQUES: We have tons of jurors who are Caucasian who are equivocal on the death penalty on this jury.
MR. ASHTON: The issue for the court under Melbourne [is] simply is that true and clearly it is. Clearly her answers are equivocal and that's the only inquiry, unless the defense is disputing the fact those are her answers. Then I think that's the end of the inquiry. I will say
THE COURT: I'll find it's a racially neutral strike. So it's allowable.
Appellant argues that if the State had a problem with Melvin's responses on the juror questionnaire, then it should have asked to individually question Melvin. Melvin provided the following answers on her questionnaire:
19. What are your feelings or opinions about the death penalty? Please explain: I guess in some cases it is all right.

20. Do you think the death penalty should always be imposed in cases of murder? Please explain: No I don't think in all cases but I do think in some if the murder was intended.

21. Do you think the death penalty should never be imposed in cases of murder? Please explain: Yes I do think the death penalty should never be imposed *580 in cases of murder it won't bring the person-persons back.

Appellant claims that jurors who eventually sat on this case gave similar answers in their questionnaires. For example, juror Meldrum, who eventually sat on the case, did not even answer question 21. The State did not use all of its peremptory challenges and therefore, Appellant asserts, the State could have challenged these other jurors but chose not to. Finally, Appellant points out that all of the jurors that eventually sat on the case were white.
In Farina v. State, No. SC93050 slip op. at 5, ___ So.2d ___, ___, 2001 WL 920230 (Fla. Aug.16, 2001), this Court set forth the following standard of review for alleged errors regarding improper peremptory challenges:
Under Melbourne v. State, 679 So.2d 759 (Fla.1996), and its progeny, the following procedure must be followed for challenging peremptory strikes of prospective jurors: (1) the objecting party must make a timely objection, must show that the venire person is a member of a distinct racial group, and must request that the court ask the striking party the reasons for the strike; (2) if the first step is met, the court must ask the proponent of the strike to explain the reason for the strike; and (3) if the reason given is facially race-neutral and the court believes that given all the circumstances surrounding the strike, the explanation is not pretext, the strike will be sustained. Id. at 764. In the third step, the court's focus is on the genuineness of the explanation, not its reasonableness. See id. On appeal, reviewing courts must be mindful of two guiding principles: peremptory challenges are presumed to be exercised in a nondiscriminatory manner; and the trial court's decision, which turns primarily on an assessment of credibility, will be affirmed on appeal unless clearly erroneous. See id.; Rodriguez v. State, 753 So.2d 29, 40 (Fla.), cert. denied, 531 U.S. 859, 121 S.Ct. 145, 148 L.Ed.2d 96 (2000).
Based upon our review of the voir dire record and the fact that the court's rulings turned on an assessment of the genuineness of the State's reasons for striking juror Melvin, we conclude that the trial court's ruling was not clearly erroneous. Hence, Appellant is not entitled to relief on this claim.
In Appellant's third claim, he argues that the trial court erred in denying his motion for judgment of acquittal. A motion for judgment of acquittal should only be granted if there is no view of the evidence from which a jury could make a finding contrary to that of the moving party. See Lynch v. State, 293 So.2d 44 (Fla.1974). Additionally, in a circumstantial evidence case, the State's evidence must be not only consistent with guilt but inconsistent with any reasonable hypothesis of innocence. See Benedith v. State, 717 So.2d 472 (Fla.1998).
In Woods v. State, 733 So.2d 980 (Fla.1999), this Court stated:
Therefore, at the outset, "the trial judge must first determine there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences." Barwick, 660 So.2d at 694. After the judge determines, as a matter of law, whether such competent evidence exists, the "question of whether the evidence is inconsistent with any other reasonable inference is a question of fact for the jury." Long v. State, 689 So.2d 1055, 1058 (Fla.1997).

Gordon, 704 So.2d at 112-13; see also State v. Law, 559 So.2d 187, 188-89 (Fla. 1989) (applying circumstantial evidence rule to determination of motion for judgment *581 of acquittal). On review, we must view the conflicting evidence in a light most favorable to the state. See Peterka v. State, 640 So.2d 59, 68 (Fla.1994). So long as competent, substantial evidence supports the jury's verdict, it will not be overturned on appeal. See id.

Id. at 985. Our review of the record reveals that there is competent, substantial evidence to support the jury's verdict. The State introduced the testimony of Appellant's sister Roxanne, who testified that in August of 1993, she overheard Appellant tell Harry Thomas that they should go out and rob and kill somebody. Further, Dennis Thomas testified that he overheard Harry Thomas and Appellant talking about robbing Wilma Martin. Appellant's fingerprint was found at the scene of the crime. Finally, the defense stipulated that Appellant pawned the victim's jewelry shortly after the murder. Therefore, we find no merit to this claim of error.
Turning to the penalty phase issues, Appellant next argues that the trial court improperly evaluated the proposed mitigating circumstances. Initially, Appellant claims that the trial court erred in applying the "beyond a reasonable doubt" standard to the determination of whether a mitigator has been established. At the conclusion of the Spencer hearing, the trial court read its sentencing order to the parties. When discussing whether or not the statutory mitigator of extreme emotional disturbance had been established, the trial court stated the following:
There has been extensive evidence, testimony, and expert opinion submitted on the issue of the defendant's mental or emotional state throughout the pendency of this case on this point. However, the court does not find evidence which supports beyond a reasonable doubt that the defendant was in fact under the influence of extreme mental or emotional disturbance at the time of murder of Wilma Martin. Therefore, the court does not find the existence of this statutory mitigator.
(Emphasis added). After the trial court finished reading the order, the following transpired:
MR. ASHTON [prosecutor]: There is one minor error that I detected in the order, I wanted to point it out. When the Court was discussing the first mental health mitigating circumstances, the court indicated as the order was read that it was not proven beyond a reasonable doubt.
As the court knows, the standard is not of a reasonable doubt but merely convincing. If that is a semantic error, the court can note that. If it was a legal error, then I wanted to point it out to the court now rather than having the appellate court
THE COURT: You are talking about statutory mitigating factor B, capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance?
MR. ASHTON: You made a comment about it being not proven beyond a reasonable doubt.
THE COURT: Yes, that is a typographical error.
MR. ASHTON: I wanted to point out to the court to make the change before pronouncing the sentence.
THE COURT: Okay. I've noted that on the record.
On the written sentencing order, the trial court crossed out the words "beyond a reasonable doubt" and wrote in "convincing the court," initialed the change and in parenthesis wrote "typographical error." Appellant claims that this was not a typographical error but rather a misconception regarding the proper standard. Despite *582 Appellant's allegation, we find no merit to this claim, as the trial court clearly stated on the record that the wording in question was merely a typographical error.
Appellant also argues that the trial court erred in rejecting the following claims of mitigation: (1) that Appellant was under the influence of extreme mental or emotional disturbance, (2) that Appellant was an accomplice and his participation was minor, and (3) that Appellant had a false belief that he suffers from an untreated venereal disease that is driving him insane. A trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). There is competent, substantial evidence in this record to support the trial court's rejection of the above mitigators. Dr. Gutman concluded that Appellant lacked the appreciation and capacity to conform his behavior to the requirements of the law. The trial court found that this mitigator exists. Dr. Gutman did not, however, conclude that Appellant was under the influence of extreme mental or emotional disturbance. Both Dr. Gutman and Dr. Fisher stated that at the time of the crime, they did not believe that Appellant suffered from any psychotic symptoms. Thus, there is competent, substantial evidence to support the trial court's rejection of this mitigator.
Regarding Appellant's participation in the murder, it is clear from the record that Appellant was a major participant, if not the only participant. During the Spencer hearing, Appellant offered mitigation regarding his alleged venereal disease. At one point in his testimony, Appellant stated the following:
I'm not going to sit here today and play along with this game and deny that I was the one that killed Wanda Martin [sic]. I killed her, not Harry Thomas. Harry Thomas was not even in the house at the time of Wilma Martin's murder. I was the only one.
Based on this testimony, we find no error in the trial court's rejection of this mitigator.
Finally, regarding the alleged venereal disease, the trial court pointed out in its sentencing order that the "defense admits that the premise or basis of this claim (of disease) is false." We find no error in this analysis or in the rejection of this mitigator.
In his fifth and final claim, Appellant asserts that the death sentence is disproportionate in this case. Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. See Terry v. State, 668 So.2d 954, 965 (Fla.1996). This Court's function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge. See Bates v. State, 750 So.2d 6, 12 (Fla.1999). This Court's proportionality review requires it to "consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
As stated above, the trial court in this case found two aggravators: (1) murder committed while engaged in the commission of a robbery and (2) HAC. The trial court found the statutory mitigator of impaired capacity to appreciate conduct. The court gave this mitigator some weight, as it found that the level of substantial impairment at the time of the crime was minimal at best. The trial court also *583 found the following nonstatutory mitigators: (1) the codefendant, who was equally culpable, pled to second-degree murder and was sentenced to twenty years (some weight); (2) the defendant has a long history of emotional and mental problems (slight weight); (3) the defendant has a long history of drug and alcohol abuse (little weight); (4) the defendant has attempted suicide (little weight); and (5) the State offered the defendant a plea to life in prison (little weight).
The circumstances of this case are similar to other cases where the death penalty has been upheld by this Court. For instance, in Shellito v. State, 701 So.2d 837 (Fla.1997), the trial court found two aggravators: previous capital felony and pecuniary gain/committed during a robbery. The trial court also found one statutory mitigator (age) and nonstatutory mitigators (background and character). Additionally, in Hayes v. State, 581 So.2d 121 (Fla.1991), the trial court found two aggravators (murder was cold, calculated and premeditated and murder committed during a robbery), one statutory mitigator (age), and other nonstatutory mitigators. Thus, we find no merit to Appellant's claim that the sentence is disproportionate in this case.
Accordingly, for the reasons expressed, we affirm the convictions and sentences, including the sentence of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Appellant raises the following issues: (1) whether the trial court erred in denying his motion to suppress his shoes; (2) whether the trial court erred in overruling his objection to the State's use of a peremptory challenge to an African American juror; (3) whether the trial court erred in denying his motion for judgment of acquittal; (4) whether the trial court improperly evaluated the mitigators; and (5) whether the sentence is proportionate.