819 So.2d 689 (2002)
Timothy Lee HURST, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1042.
Supreme Court of Florida.
April 18, 2002.
Rehearing Denied June 3, 2002.
*692 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a sentence of death upon Timothy Lee Hurst. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm Hurst's conviction for first-degree murder and his sentence of death.

MATERIAL FACTS
The trial record reflects the underlying relevant facts giving rise to Hurst's conviction and sentence. On the morning of May 2, 1998, a murder and robbery occurred at a Popeye's Fried Chicken restaurant in Escambia County, Florida, where Hurst was employed. Hurst and the victim, assistant manager Cynthia Lee Harrison, were scheduled to work at 8 a.m. on the day of the murder. A worker at a nearby restaurant, Carl Hess, testified that he saw Harrison arriving at work between 7 a.m. and 8:30 a.m. Afterwards, Hess said that he saw a man, who was about six feet tall and weighed between 280 and 300 pounds, arrive at Popeye's and bang on the glass windows until he was let inside. The man was dressed in a Popeye's uniform and Hess recognized him as someone he had seen working at Popeye's. Shortly after the crime, Hess picked Hurst from a photographic lineup as the man he had seen banging on the windows. Hess was also able to identify Hurst at trial.
On the morning of the murder, a Popeye's delivery truck was making the rounds at Popeye's restaurants in the area. Janet Pugh, who worked at another Popeye's, testified she telephoned Harrison at 7:55 a.m. to tell her that the delivery truck had just left and Harrison should expect the truck soon. Pugh spoke to the victim for four to five minutes and did not detect that there was anything wrong or hear anyone in the background. Pugh was certain of the time because she looked at the clock while on the phone.
Popeye's was scheduled to open at 10:30 a.m. but Harrison and Hurst were the only employees scheduled to work at 8 a.m.[1] However, at some point before opening, two other Popeye's employees arrived, in addition to the driver of the supply truck. None of them saw Hurst or his car. At 10:30 a.m., another Popeye's assistant manager, Tonya Crenshaw, arrived and found the two Popeye's employees and the truck driver waiting outside the locked restaurant.
When Crenshaw unlocked the door, and she and the delivery driver entered, they discovered that the safe was unlocked and open, and the previous day's receipts, as well as $375 in small bills and change, were missing. The driver discovered the victim's dead body inside the freezer. The *693 victim had her hands bound behind her back with black electrical tape and she also had tape over her mouth. Similar tape was later found in the trunk of Hurst's car. The scene was covered with a significant amount of the victim's blood, and it was apparent from water on the floor that someone had attempted to clean up the area.
The victim suffered a minimum of sixty incised slash and stab wounds, including severe wounds to the face, neck, back, torso, and arms. The victim also had blood stains on the knees of her pants, indicating that she had been kneeling in her blood. A forensic pathologist, Dr. Michael Berkland, testified that some of the wounds cut through the tissue into the underlying bone, and while several wounds had the potential to be fatal, the victim probably would not have survived more than fifteen minutes after the wounds were inflicted. Dr. Berkland also testified that the victim's wounds were consistent with the use of a box cutter. A box cutter was found on a baker's rack close to the victim's body. Later testing showed that the box cutter had the victim's blood on it. It was not the type of box cutter that was used at Popeye's, but was similar to a box cutter that Hurst had been seen with several days before the crime.
Hurst's friend, Michael Williams, testified that Hurst admitted to him that he had killed Harrison. Hurst told him that he had an argument with the victim, she "retaliated," and that Hurst hit the victim and cut her with a box cutter. Hurst said he had killed the victim because, "he didn't want the woman to see his face." Williams stated that Hurst had talked about robbing Popeye's on previous occasions.
Another of Hurst's friends, "Lee-Lee" Smith, testified that the night before the murder, Hurst said he was going to rob Popeye's. On the morning of the murder, Hurst came to Smith's house with a plastic container full of money from the Popeye's safe. Hurst instructed Smith to keep the money for him. Hurst said he had killed the victim and put her in the freezer. Smith washed Hurst's pants, which had blood on them, and threw away Hurst's socks and shoes. Later that morning, Smith and Hurst went to Wal-Mart to purchase a new pair of shoes.[2] They also went to a pawn shop where Hurst saw some rings he liked, and after returning to Smith's house for the stolen money, Hurst returned to the shop and purchased the three rings for $300. An employee at the shop, Bob Little, testified that on the day of the murder, a man fitting Hurst's description purchased three rings. Little picked Hurst out of a photographic lineup as the man who had purchased the rings. The police recovered the three rings from Hurst.
Smith's parents were out of town the weekend of the murder but upon their return, and after discovering the container with the money from Popeye's in Smith's room, Smith's mother contacted the police and turned the container over to them. The police interviewed Smith and searched a garbage can in Smith's yard where they found a coin purse that contained the victim's driver's license and other property, a bank bag marked with "Popeye's" and the victim's name, a bank deposit slip, a sock with blood stains on it, and a sheet of *694 notebook paper marked "Lee Smith, language lab." On the back of the notebook paper someone had added several numbers, and one number was the same as the amount on the deposit slip. Smith's father also gave the police a pair of size fourteen shoes that appeared to have blood stains on them and that he had retrieved from the same trash can.
Jack Remus, a Florida Department of Law Enforcement (FDLE) crime lab analyst, testified that the shoes were tested with phenolpthalein to detect blood, and while the test results exhibited some of the chemical indications associated with blood, attempts at DNA testing were not successful. Remus also tested the blood-stained sock and determined that the DNA typing was consistent with the victim. Hurst's pants were also tested, but no blood evidence was detected. FDLE fingerprint expert Paul Norkus testified that the deposit slip in the garbage can had three of Hurst's fingerprints on it.
At trial, the State played the tape of an interview the police had conducted with Hurst shortly after the murder. Hurst said that on the morning of the murder he was on his way to work and his car broke down. He said that he telephoned Harrison at Popeye's to say he was unable to come to work, and when he talked to her, she sounded scared and he heard whispering in the background. Hurst then went to Smith's house and changed out of his work clothes. Hurst said he went to the pawn shop and bought necklaces for friends, but he did not mention purchasing the three rings or buying a new pair of shoes at Wal-Mart.
At the close of the guilt phase of the trial, the jury deliberated for approximately six hours before finding Hurst guilty of first-degree murder. During the penalty phase, several of Hurst's family members testified that Hurst was slow and that his emotional and mental development was not as advanced as other people his age. After the completion of penalty phase testimony, the court instructed the jury on two aggravating circumstances and on a number of mitigating circumstances. The jury voted eleven-to-one to recommend the death penalty.
The trial court sentenced Hurst to death, and found three aggravating circumstances: (1) the murder was committed by a person engaged in the commission of a robbery ("great weight"); (2) the murder was especially heinous, atrocious, and cruel (HAC) ("great weight"); and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest ("great weight"). The avoid arrest aggravating circumstance was not argued by the State and no instruction on that aggravator was read to the jury. In mitigation, the court considered a number of claimed mitigating factors and rejected most, including four determinations which Hurst now challenges:[3] (1) Hurst has a good family background ("no weight"); (2) Hurst's contribution to the community was good in that he assisted his church and assisted his neighbors during their time of need ("little weight"); (3) Hurst maintained regular church attendance and involved *695 himself in weekly Bible study ("little weight"); (4) Hurst's age ("very little weight").[4]

ANALYSIS
Hurst raises four issues in his appeal, all of which pertain to the penalty phase of his trial.[5] Despite the lack of challenge, we have examined the record and have determined that there was competent and substantial evidence presented to support the conviction for murder. We have already referred to that evidence in some detail.[6]

"Avoid Arrest" Aggravating Circumstance
Hurst does not challenge the aggravating factors found by the trial court that the murder was especially heinous, atrocious, or cruel (HAC), or that the murder took place during the course of a robbery. However, Hurst does challenge the trial court's finding of the statutory "avoid arrest" aggravating factor. See § 921.141(5)(e), Fla. Stat. (2000). Hurst first challenges this finding on the basis that the State did not request this aggravator and the jury was not instructed on this aggravator. We do not reach this challenge because we hold that the evidence does not support the avoid arrest aggravator, but the trial court's error in finding this aggravator was harmless as to the sentence actually imposed upon Hurst.
This Court stated in Willacy v. State, 696 So.2d 693 (Fla.1997), that:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 695 (footnotes omitted). In order to establish that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, the evidence must prove beyond a reasonable doubt that the sole or dominant motive for the killing was to eliminate a witness. See Zack v. State, 753 So.2d 9, 20 (Fla.2000). In Riley v. State, 366 So.2d 19, 22 (Fla.1978), this Court held that the avoid arrest aggravator could apply to the murder of a witness to a crime in addition to law enforcement personnel. However, this Court cautioned that "the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement official. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases." Id. at 22. In the instant case, there is no competent, substantial evidence to prove that Hurst's dominant motive for the murder was the elimination of a witness.
While the evidence reflects that Hurst may have had numerous motives for *696 committing the murder, there is no proof indicating that Hurst's dominant motive was to avoid arrest. The trial court found the avoid arrest aggravator based on the defendant's relationship with the victim and the belief that the robbery could have been successfully completed without committing the murder. However, this Court has stated that "the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator." Consalvo v. State, 697 So.2d 805, 819 (Fla.1996).
The State asserts that Hurst's intent to avoid arrest is shown by Hurst's statement after the murder that he had not wanted the victim to "see his face." This statement does not indicate that Hurst's dominant motive was witness elimination. In similar cases where this Court upheld the finding of the avoid arrest aggravator, statements from the defendants clearly implied a dominant motive for witness elimination. See Jennings v. State, 718 So.2d 144, 151 (Fla.1998) ("[T]here was further evidence presented that Jennings ... stated that if he ever committed a robbery, he would not leave any witnesses."); see also Looney v. State, 803 So.2d 656, 677 (Fla. 2001) (finding avoid arrest aggravator when direct testimony indicated that defendants stated "we can't have no witness to all this stuff ... so we're going to have to do this here." (omission in original)); Lopez v. State, 536 So.2d 226, 230 (Fla. 1988) ("Lopez later told one of his accomplices... that he had to shoot the victims because they could not afford to leave any witnesses behind.").
In the instant case, the same witness who testified that Hurst did not want the victim to "see his face" testified that Hurst told the witness after the murder that "[Hurst] had an argument with [the victim] and she retaliated. He hit her. Then he cut her." Thus, the evidence supports the finding that there were several possible motives for this murder, but does not support a finding that Hurst's dominant motive was avoiding arrest. Cf. Connor v. State, 803 So.2d 598, 610 (Fla.2001) (finding avoid arrest aggravator was not supported by competent, substantial evidence where evidence reflected it was entirely plausible that witness elimination had nothing to do with murder). The trial court therefore erred in finding the avoid arrest aggravator.
However, despite our finding that the trial court erred in finding the avoid arrest aggravator, we conclude that the error was harmless to Hurst. Eliminating this aggravating factor does not affect the death sentence in light of the two remaining aggravating factors weighed against the relatively weak mitigation. While the trial court gave the HAC and committed during the course of the robbery aggravators great weight, none of the mitigating circumstances considered by the trial court were given great weight. Striking the avoid arrest aggravator does not change the facts that were considered by the trial court in sentencing Hurst. Moreover, the jury recommended death by a vote of eleven to one after being instructed on only the two remaining aggravating factors. Since the jury was not instructed on this aggravator and the State did not argue the aggravator to the jury, it is obvious that Hurst was not disadvantaged in the jury's recommendation by this aggravator. See Hoffman v. State, 474 So.2d 1178, 1182 (Fla.1985). Thus we find beyond a reasonable doubt that striking this aggravating factor would not change the trial court's decision to sentence Hurst to death. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); Ferguson v. Singletary, 632 So.2d 53, 58 (Fla.1993) (noting that this Court has "made it clear that a death sentence may be affirmed where an aggravating *697 circumstance is stricken as long as the Court is convinced that the error was harmless"). Accordingly, we find no basis for relief.

MITIGATION
In his second claim, Hurst argues that the trial court erred by failing to assign sufficient mitigation weight to Hurst's age at the time of the crime, his contribution to the community, and his religious activities. Hurst also challenges the trial court's decision rejecting his "good family background" as nonstatutory mitigation.
We have previously noted that a trial court's written order must carefully evaluate each mitigating circumstance offered by the defendant, decide if it has been established, and assign it a proper weight. See Campbell v. State, 571 So.2d 415, 419 (Fla.1990). A trial court "must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." Id. (footnote omitted). Determining whether a mitigating circumstance exists and the weight to be given to existing mitigating circumstances are matters within the discretion of the sentencing court. See Campbell v. State, 571 So.2d at 420. A trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection. See Mansfield v. State, 758 So.2d 636, 646 (Fla.2000); Ferrell v. State, 653 So.2d 367, 371 (Fla.1995). Furthermore, the trial court's conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record. See Mansfield, 758 So.2d at 646; Ferrell, 653 So.2d at 371.

Age
In the instant case, the trial judge found Hurst's age to be a mitigating circumstance, but assigned it very little weight. In considering age as a mitigating circumstance in Hurst's case, the trial court found the following in its sentencing order:
The Defendant was eighteen years of age when he murdered the victim. The defendant was legally an adult and he owned his own car and was employed. Under these circumstances, the Defendant's age should not be considered as a mitigating factor and to this the Court will give very little weight.
In considering a defendant's age, we have held that the death penalty is cruel or unusual punishment violative of the Florida Constitution when it is imposed on a defendant who was less than seventeen when committing the crime. See Brennan v. State, 754 So.2d 1, 7 (Fla.1999); see also Allen v. State, 636 So.2d 494, 497 (Fla. 1994) (death penalty may not be applied to one under sixteen).[7] However, where the *698 defendant is not a minor, i.e., under eighteen, "no per se rule exists which pinpoints a particular age as an automatic circumstance in mitigation. Instead, the trial judge is to evaluate the defendant's age based on the evidence adduced at trial and at the sentencing hearing." Shellito v. State, 701 So.2d 837, 843 (Fla.1997) (citation omitted) (citing Peek v. State, 395 So.2d 492, 498 (Fla.1980)).
For a court to give a non-minor defendant's age significant weight as a mitigating circumstance, the defendant's age must be linked with some other characteristic of the defendant or the crime, such as significant emotional immaturity or mental problems. See Mahn v. State, 714 So.2d 391, 400 (Fla.1998) (holding that age was a mitigating circumstance where defendant's long history of substance abuse, mental and emotional instability, and passivity in the face of mental and physical abuse provided the essential link between defendant's age and immaturity).[8]
As noted above, there is some confusion in the record as to Hurst's actual age at the time of the crime, but it appears that he was at least eighteen, and thus was chronologically and legally above the age of a minor. He also worked and had his own car. Further, although members of Hurst's family testified that he was slow and emotionally immature, there was testimony that Hurst's performance in school was adequate and that he helped with taking care of the younger children in the family. The only testimony about his mental and emotional development came from his family. The limited evidence presented regarding Hurst's age does not rise to the level of the substantial evidence of a defendant's mental and emotional problems we have seen in other cases such as Mahn v. State, where we have concluded that defendants with a chronological age similar to Hurst were entitled to age as a significant mitigating circumstance.[9]
While the trial court's findings as to the age mitigating circumstance were rather sparse, we note the trial court also commented on Hurst's alleged emotional and maturity level limitations when it discussed other mitigating circumstances in the sentencing order. In analyzing the statutory mitigating circumstance regarding Hurst's capacity to appreciate the criminality of his conduct, the trial court noted that there was no testimony presented by the defense from mental health experts. The trial court also noted that Hurst's mother testified that Hurst did not have any psychiatric problems and that Hurst made average grades in school. Given the lack of significant evidence presented to demonstrate Hurst's particular immaturity or mental problems, we find the trial court did not abuse its discretion in assigning Hurst's age "very little weight" as a mitigating circumstance.

*699 Family Background

Hurst also challenges the trial court's decision to reject "good family background" as a mitigating circumstance and its assignment of "no weight." As to Hurst's family background as a mitigating circumstance, the trial court found:
The fact that the Defendant may have a good family background is not a mitigating factor that should be considered by this Court and to this the Court will give no weight.
It is unclear how much weight a "good family background" should be given as a mitigating circumstance. However, cases where significant weight has been assigned to previous family history have usually involved situations where the defendant asserted that he had a troubled background with a family history of instability, poverty, or abuse. See, e.g., Parker v. State, 643 So.2d 1032, 1035 (Fla.1994); Besaraba v. State, 656 So.2d 441, 446 (Fla.1995). The limited testimony from Hurst's family members tended to show that Hurst was a good student, was nonviolent, and had good relationships with family members. This uncontroverted evidence may have been enough to establish the existence of a "good family background" in this case and entitle Hurst to some weight mitigating against the death sentence. See, e.g., Torres-Arboleda v. Dugger, 636 So.2d 1321, 1325 (Fla.1994) (holding that evidence of family background and personal history, such as the fact that defendant was a good student and child, and that defendant supported his family after his father's death, was evidence that could be considered in mitigation). Thus, to the extent that the trial court's sentencing order can be read as completely rejecting the possibility of good family background as a mitigating circumstance, we hold that the trial court erred.
However, we would also note that the trial court's sentencing order reflected that the court considered Hurst's assistance around the house, his attendance at church and Bible study, and his contribution to the community, each of which could be evidence of Hurst's "good family background." Furthermore, when we review the findings of aggravation and mitigation in toto, we conclude that even if the trial court erred in assigning no weight to Hurst's "good family background," any error is harmless given the severity of the aggravating circumstances in this case.

Contribution to Community and Church Attendance
Finally, Hurst argues that the trial judge erred in assigning little weight to both Hurst's contribution to his community and to his regular attendance at church.[10] Hurst claims the trial judge improperly *700 minimized the weight of mitigation associated with Hurst's contributions to the community and his religious activities. Hurst notes that the State did not rebut any of the evidence presented and the court did not give any reason that Hurst's family members were not credible. Hurst also cites to this Court's opinion in Nibert v. State, 574 So.2d 1059 (Fla.1990), for the proposition that a trial court is not free to reject, without reason, unrefuted testimony regarding mitigating evidence.
In Nibert this Court found that the trial court erred when it found "possible" mitigation where the defendant had undergone years of physical and psychological abuse as a child, but then dismissed the mitigation because the defendant was now an adult. Nibert, 574 So.2d at 1062. We rejected this analysis as inapposite because "[t]he fact that a defendant had suffered through more than a decade of psychological abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse finally came to an end." Id.
However, in the instant case, the trial court found that Hurst's religious activities and community service provided some mitigation, but that the evidence did not establish either mitigating circumstance to any appreciable degree and, thus, the court gave each mitigating circumstance little weight. Further, even though the State did not rebut Hurst's family members' testimony, it is still within the trial court's discretion to assign the appropriate amount of weight to this circumstance. Banks v. State, 700 So.2d 363, 368 (Fla. 1997) (holding that trial court did not abuse its discretion in rejecting defendant's religious activities as mitigating). The trial court's conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record. Campbell, 571 So.2d at 420.
In fact, even the testimony of Hurst's family members was limited as to his religious activities and contribution to the community. Only Hurst's parents provided testimony as to these mitigating circumstances, and as to Hurst's contribution to the community, there was no elaboration as to what his contribution was or how Hurst helped out in the neighborhood. Clearly, the instant case can be distinguished from a case where a number of nonfamilial community or church members provide extensive testimony on the defendant's behalf.
Under the circumstances presented, we find no error in the trial court's decision assigning little weight to these two nonstatutory mitigating factors.

PROPORTIONALITY
Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In conducting this review, this Court considers the totality of the circumstances in a case as compared to other cases in which the death penalty has been imposed, thereby providing for uniformity in the application of the death penalty. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998); Porter v. State, 564 So.2d at 1064. The death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin, 714 So.2d at 416; State v. Dixon, 283 So.2d 1, 7 (Fla.1973).
In his argument regarding proportionality, Hurst cites a large number of cases where the Court has found that the death sentence was disproportionate. However, Hurst's case and these cases are distinguishable, because the cases he cites have *701 either more significant mitigation or less egregious aggravating circumstances.
For example, Hurst relies in particular on Snipes v. State, 733 So.2d 1000 (Fla. 1999), Urbin v. State, 714 So.2d 411 (Fla. 1998), and Williams v. State, 707 So.2d 683 (Fla.1998), as comparable cases. In Snipes, the defendant killed in a murder-for-hire situation. See Snipes, 733 So.2d at 1002. Even though the cold, calculated, and premeditated and pecuniary gain aggravating circumstances existed, the Court found that the death penalty was disproportionate based on the large amount of substantial mitigation.[11] In Urbin, this Court also found that the defendant's death sentence was disproportionate based on the aggravation and mitigation. See Urbin, 714 So.2d at 418. In aggravation, the defendant had the previous violent felony and felony murder aggravating circumstances. Id. at 415 n. 2. The Court struck the trial court's finding of the avoid arrest aggravating circumstance. Id. at 417. As in Snipes, there was a large amount of substantial mitigation.[12] Finally, in Williams, after the Court struck the "under sentence of imprisonment" aggravating circumstance, the defendant was left with only the pecuniary gain aggravating circumstance and there was a moderate amount of mitigation: age; exemplary prisoner while waiting for trial; possibility of rehabilitation; religion; plans to get involved in prison ministry; and work capacity. See Williams, 707 So.2d at 684-86. Except for the defendant's age, which was given "substantial weight," the trial court gave most of the mitigation relatively little weight. Id. at 684-85. Still, based on the remaining aggravating circumstance and a review of relevant cases, the Court found the defendant's death sentence to be disproportionate. Id. at 686. In the instant case, Hurst had little mitigation and more weighty aggravation, and thus a comparison of the cases does not demonstrate disproportionate treatment.
As noted above, the trial court found two aggravating circumstances that were presented to the jury and argued by the State: (1) HAC (great weight); and (2) the murder was committed during the course of a robbery (great weight). The trial court also independently found that (3) the murder was committed for the purpose of avoiding arrest (great weight).
The trial court discussed three statutory mitigating circumstances: (1) Hurst's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (little weight);[13] (2) no prior history *702 of criminal conduct (moderate weight); (3) Hurst's age at the time of the crime (very little weight). The court also found four nonstatutory mitigating circumstances: (1) Hurst exhibited good conduct throughout every phase of the trial (little weight); (2) Hurst's contribution to the community was good in that he assisted his church and he assisted his neighbors in their time of need (little weight); (3) Hurst maintained regular church attendance and involved himself in weekly Bible study (little weight); (4) Hurst assisted his mother and father around the home and took care of and protected his younger siblings (moderate weight). Hurst's lack of previous convictions and his help around the house were given moderate weight, and all the other mitigators were given little weight or very little weight. Furthermore, the jury voted eleven-to-one in favor of the death sentence after being instructed on only two aggravating circumstances.
The strong aggravation and the relatively little mitigation in this case is similar to other cases where the death penalty has been imposed and upheld. In fact, this Court recently affirmed the death sentence of a defendant who, like Hurst, had the HAC and "during the commission of a robbery" aggravating circumstances. See Jeffries v. State, 797 So.2d 573 (Fla.2001). While Hurst was younger, with mitigation value of "very little weight" assigned to his age, the mitigation in Jeffries was much more substantial than the mitigation found in the instant case. The Jeffries trial court found six mitigating circumstances: (1) defendant's capacity to appreciate the criminality of his conduct was impaired (some weight); (2) defendant's codefendant, who was equally culpable, pled guilty to second-degree murder and was sentenced to twenty years (some weight); (3) the defendant had a long history of mental problems (slight weight); (4) the defendant had a long history of drug and alcohol abuse (little weight); (5) defendant had attempted suicide (little weight); (6) the State offered the defendant a plea of life in prison (little weight). Like the jury in Hurst's trial, the jury in Jeffries recommended the death sentence by an elevento-one vote. See also Geralds v. State, 674 So.2d 96, 105 (Fla.1996) (affirming death sentence where murder was HAC and committed during the commission of a robbery and both statutory and nonstatutory mitigation was afforded little weight).
In sum, even after striking the avoid arrest aggravating circumstance, two aggravating circumstances still exist in this case including, importantly, the very serious heinous, atrocious, and cruel aggravator. This substantial aggravation must be compared to the negligible mitigation found by the trial court. Even if the trial court marginally erred in assigning the appropriate weight to mitigation, as Hurst claims, after reviewing the record, we are convinced that the amount of mitigation evidence that was presented was minimal, at best. Thus, after conducting our proportionality review, we find no merit in Hurst's claim that the death sentence is disproportionate in this case.

"Apprendi" Claim
In his final claim, Hurst argues that "imposition of the death sentence in the absence of notice of the aggravating circumstances to be considered or of jury findings on the aggravators and death eligibility, violates due process and the protection against cruel and/or unusual punishment." In making this argument, Hurst relies primarily on the United *703 States Supreme Court's opinion in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Subsequent to the filing of Hurst's initial brief, this Court decided this issue and has rejected the argument that the Apprendi case applies to Florida's capital sentencing scheme. See Mills v. Moore, 786 So.2d 532 (Fla.), cert. denied, 532 U.S. 1015, 121 S.Ct. 1752, 149 L.Ed.2d 673 (2001); Mann v. Moore, 794 So.2d 595 (Fla.2001). In his reply brief, Hurst requests that this Court revisit the Mills decision and find that Apprendi does apply to capital sentencing schemes. Having considered the cases Hurst cited and his additional arguments, this Court finds no reason to revisit the Mills decision, and thus we reject Hurst's final claim.

CONCLUSION
Accordingly, for the reasons expressed, we affirm Hurst's conviction and sentence of death.
It is so ordered.
WELLS, C.J., and HARDING, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which SHAW and PARIENTE, JJ., concur.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in most all respects with the majority opinion, with the important exception, however, of its harmless error analysis as to the trial court's error in finding the avoid arrest aggravating circumstance.
I agree with the majority's holding that the trial court erred in finding and weighing the avoid arrest aggravator. In fact, it is clear from the record that during the penalty phase the State expressly waived any reliance upon this aggravator. However, because the trial court not only clearly relied upon this aggravating circumstance in determining appellant's sentence, but also assigned it the highest level of weight, I cannot agree that the trial court's error was harmless. Thus, I would remand for resentencing by the trial court without consideration of the erroneous aggravator.
I agree that when the Court "strikes one or more aggravating circumstances relied upon by a trial judge in sentencing a defendant to death, we may conduct a harmless error analysis based on what the sentencer found in determining whether the sentence of death is still appropriate." See Hill v. State, 643 So.2d 1071, 1073 (Fla. 1994). However, an error in weighing the aggravating and mitigating circumstances is not harmless where the absence of the error could have resulted in a lesser sentence. Rogers v. State, 511 So.2d 526, 535 (Fla.1987). In our seminal decision in State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986), we explicitly held that only where the State has demonstrated there is no reasonable possibility that the error affected the outcome, can an error be considered harmless.
Furthermore, in conducting a harmless error analysis, this Court must not "misread the trial judge's findings regarding mitigating circumstances and affirm based on a mischaracterization of the trial judge's findings." Parker v. Dugger, 498 U.S. 308, 320, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); see also Hill v. State, 643 So.2d at 1073-74. While this Court's underlying decision in Parker concerned a mischaracterization of the trial court's mitigation findings, it is equally important that we not mischaracterize the trial court's aggravation findings in our harmless error evaluation. The majority's decision requires the Court to ignore the "great weight" that the stricken aggravator *704 was given in the trial court's decision to impose the death penalty. When a trial court's sentencing order acknowledges that a particular aggravator played a key role in the decision to impose the death penalty, the subsequent removal of that aggravator cannot reasonably be deemed harmless.
One need simply read the trial court's sentencing order to see that the finding of that aggravator was of key importance in the trial court's decision to sentence Hurst to death. Specifically, the trial court found:
While not argued by the State, it is apparent that there was no need for the Defendant to kill the victim just to obtain the money from the safe. The victim knew the Defendant inasmuch as both the victim and the Defendant were employed at Popeye's. The Defendant could have taken the money and fled leaving the victim unharmed. Therefore, one can only conclude that the killing of the victim was for the sole purpose of avoiding arrest for robbery. Accordingly, to this aggravating circumstance the Court will give great weight.
In the instant case, the trial court's sentencing order indicates that the stricken aggravator was given "great weight." Under such circumstances this error could hardly be deemed harmless as having no effect on the sentencing decision.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] Before 10:30, the doors would have remained locked, causing the State to develop the theory that the victim must have known her killer and trusted the person enough to open the locked door.
[2] The Wal-Mart accounting office manager and records custodian, Deborah McKnight, testified that on May 2, 1998, a pair of LA Gear white and navy shoes were purchased at 10:10 a.m. and no other shoes of this type were purchased on the day of the murder. The police found a pair of LA Gear shoes in Hurst's car with the Wal-Mart sales ticket on them.
[3] Hurst does not challenge six of the trial court's sentencing order decisions on mitigating factors, including: (1) Hurst acted under the substantial dominion of another person, Lee-Lee Smith ("no weight"); (2) Hurst's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired ("little weight"); (3) Hurst exhibited good conduct through every phase of the trial ("little weight"); (4) Hurst has no prior criminal history ("moderate weight"); (5) lack of future dangerousness ("no weight"); (6) Hurst assisted his mother and father around the home and took care of and protected his younger siblings ("moderate weight").
[4] There are discrepancies in the record as to whether Hurst was eighteen or nineteen when the murder was committed.
[5] These issues include: (1) the trial court erred in finding the avoid arrest aggravating circumstance because it was never presented to the jury or judge via argument or instruction and because the evidence does not support the existence of the factor; (2) the court failed to properly consider and weigh the statutory and nonstatutory mitigating circumstances; (3) the death sentence is disproportionate; and (4) imposition of the death sentence in the absence of notice of the aggravating circumstances to be considered or of jury findings on the aggravating circumstances and death eligibility violates due process and the protection against cruel and unusual punishment.
[6] See supra pp. 1-7.
[7] In Urbin v. State, 714 So.2d 411, 418 (Fla. 1998), we explained:

In Allen v. State, 636 So.2d 494, 497 (Fla.1994), we held that the death penalty was either "cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution." Here the defendant is seventeen, below the age of majority, although above the constitutional line for the death penalty. However, considering that it is the patent lack of maturity and responsible judgment that underlies the mitigation of young age, Livingston [v. State, 565 So.2d 1288 (Fla.1988)], the closer the defendant is to the age where the death penalty is constitutionally barred, the weightier this statutory mitigator becomes. This is especially true when there is extensive evidence of parental neglect and abuse that played a significant role in the child's lack of maturity and responsible judgment.
[8] In Mahn we explained:

However, the record shows that Mahn was far from a normal nineteen-year old boy at the time of the killings. Rather, Mahn had an extensive, ongoing, and unrebutted history of drug and alcohol abuse, coupled with lifelong mental and emotional instability. Mahn's unrefuted, long-term substance abuse, chronic mental and emotional instability, and extreme passivity in the face of unremitting physical and mental abuse provided the essential link between his youthful age and immaturity which should have been considered a mitigating factor in this case. Cf. Campbell v. State, 679 So.2d 720, 725-26 (Fla.1996) (finding trial court erred in not giving requested jury instruction on age as a mitigating circumstance when expert psychological testimony linked defendant's age of twenty-one with his "significant emotional immaturity"). Therefore, we find that the trial court abused its discretion in rejecting Mahn's age as a statutory mitigating circumstance.
[9] See supra note 8.
[10] In the sentencing order, the court wrote:

6. The Defendant's contribution to the community was good in that he assisted his church and he assisted his neighbors during their time of need.
The only evidence offered by the Defendant in support of this factor was the testimony of Defendant's parents and sister. No one else from the community or the church testified. Accordingly, this Court is of the opinion that this mitigating factor has not been established to any appreciable degree and to this factor the Court will give little weight.
7. The Defendant maintained regular church attendance and involved himself in weekly Bible study.
Again, only Defendant's family members testified as to this factor. There was no corroborating evidence from the pastor of Defendant's church or the Bible teacher. Accordingly, this Court is of the opinion that this mitigating factor has not been established to any appreciable degree and to this factor the Court will give little weight.
[11] Specifically, the defendant was seventeen when the crime was committed; he was sexually abused for a number of years as a child; he abused drugs and alcohol beginning at a young age; he was raised in a dysfunctional, alcoholic family, and suffered from childhood trauma; he had many positive personality traits (potential for rehabilitation, obtained his GED, had "sweet and loving" character, and participated in drug rehabilitation); he suffered from emotional stress and a personality disorder; he voluntarily confessed to the crime, expressed remorse and the crime was arranged by older individuals; the defense presented significant expert testimony about defendant's psychological problems. Snipes, 733 So.2d at 1007-08.
[12] The defendant had suffered severe neglect and abuse; he was seventeen when the crime was committed; his mother spent several of his formative years in jail; he was surrounded by drugs and alcohol, and may have been molested; he was addicted to drugs and alcohol; the defense presented significant expert testimony about defendant's psychological problems.
[13] There is some discrepancy in the sentencing order as to whether the trial court actually found that this mitigating circumstance had been established. The court wrote: "There was absolutely no evidence that [Hurst's] capacity was substantially impaired. To this mitigating factor the Court will give little weight." Because the court assigned some weight to this statutory mitigating factor, it seems as though the court found that it had been established, but that based on the limited evidence, Hurst was entitled to little mitigating weight.