# Supreme Court of Florida

_____

No. SC12-1947
_____

**TIMOTHY LEE HURST,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 1, 2014]

PER CURIAM.

Timothy Lee Hurst appeals his sentence of death that was imposed for the 1998 first-degree murder of Cynthia Harrison. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm his sentence.

## FACTS AND PROCEDURAL HISTORY

Hurst was convicted for the May 2, 1998, first-degree murder of Cynthia Harrison in a robbery at the Popeye's restaurant where Hurst was employed in Escambia County, Florida. The victim, also an employee, had been bound and gagged and repeatedly cut and stabbed with a weapon consistent with a box cutter found at the scene. Hurst's conviction and death sentence were originally affirmed

in Hurst v. State, 819 So. 2d 689 (Fla. 2002). In that decision, we set forth the facts surrounding the murder as follows:

On the morning of May 2, 1998, a murder and robbery occurred at a Popeye's Fried Chicken restaurant in Escambia County, Florida, where Hurst was employed. Hurst and the victim, assistant manager Cynthia Lee Harrison, were scheduled to work at 8 a.m. on the day of the murder. A worker at a nearby restaurant, Carl Hess, testified that he saw Harrison arriving at work between 7 a.m. and 8:30 a.m. Afterwards, Hess said that he saw a man, who was about six feet tall and weighed between 280 and 300 pounds, arrive at Popeye's and bang on the glass windows until he was let inside. The man was dressed in a Popeye's uniform and Hess recognized him as someone he had seen working at Popeye's. Shortly after the crime, Hess picked Hurst from a photographic lineup as the man he had seen banging on the windows. Hess was also able to identify Hurst at trial.

On the morning of the murder, a Popeye's delivery truck was making the rounds at Popeye's restaurants in the area. Janet Pugh, who worked at another Popeye's, testified she telephoned Harrison at 7:55 a.m. to tell her that the delivery truck had just left and Harrison should expect the truck soon. Pugh spoke to the victim for four to five minutes and did not detect that there was anything wrong or hear anyone in the background. Pugh was certain of the time because she looked at the clock while on the phone.

Popeye's was scheduled to open at 10:30 a.m. but Harrison and Hurst were the only employees scheduled to work at 8 a.m. However, at some point before opening, two other Popeye's employees arrived, in addition to the driver of the supply truck. None of them saw Hurst or his car. At 10:30 a.m., another Popeye's assistant manager, Tonya Crenshaw, arrived and found the two Popeye's employees and the truck driver waiting outside the locked restaurant.

When Crenshaw unlocked the door, and she and the delivery driver entered, they discovered that the safe was unlocked and open, and the previous day's receipts, as well as $375 in small bills and change, were missing. The driver discovered the victim's dead body inside the freezer. The victim had her hands bound behind her back with black electrical tape and she also had tape over her mouth. Similar tape was later found in the trunk of Hurst's car. The scene was covered with a significant amount of the victim's blood, and it

was apparent from water on the floor that someone had attempted to clean up the area.

The victim suffered a minimum of sixty incised slash and stab wounds, including severe wounds to the face, neck, back, torso, and arms. The victim also had blood stains on the knees of her pants, indicating that she had been kneeling in her blood. A forensic pathologist, Dr. Michael Berkland, testified that some of the wounds cut through the tissue into the underlying bone, and while several wounds had the potential to be fatal, the victim probably would not have survived more than fifteen minutes after the wounds were inflicted. Dr. Berkland also testified that the victim's wounds were consistent with the use of a box cutter. A box cutter was found on a baker's rack close to the victim's body. Later testing showed that the box cutter had the victim's blood on it. It was not the type of box cutter that was used at Popeye's, but was similar to a box cutter that Hurst had been seen with several days before the crime.

Hurst's friend, Michael Williams, testified that Hurst admitted to him that he had killed Harrison. Hurst told him that he had an argument with the victim, she "retaliated," and that Hurst hit the victim and cut her with a box cutter. Hurst said he had killed the victim because, "he didn't want the woman to see his face." Williams stated that Hurst had talked about robbing Popeye's on previous occasions.

Another of Hurst's friends, "Lee-Lee" Smith, testified that the night before the murder, Hurst said he was going to rob Popeye's. On the morning of the murder, Hurst came to Smith's house with a plastic container full of money from the Popeye's safe. Hurst instructed Smith to keep the money for him. Hurst said he had killed the victim and put her in the freezer. Smith washed Hurst's pants, which had blood on them, and threw away Hurst's socks and shoes. Later that morning, Smith and Hurst went to Wal-Mart to purchase a new pair of shoes. They also went to a pawn shop where Hurst saw some rings he liked, and after returning to Smith's house for the stolen money, Hurst returned to the shop and purchased the three rings for $300. An employee at the shop, Bob Little, testified that on the day of the murder, a man fitting Hurst's description purchased three rings. Little picked Hurst out of a photographic lineup as the man who had purchased the rings. The police recovered the three rings from Hurst.

Smith's parents were out of town the weekend of the murder but upon their return, and after discovering the container with the

money from Popeye's in Smith's room, Smith's mother contacted the police and turned the container over to them. The police interviewed Smith and searched a garbage can in Smith's yard where they found a coin purse that contained the victim's driver's license and other property, a bank bag marked with "Popeye's" and the victim's name, a bank deposit slip, a sock with blood stains on it, and a sheet of notebook paper marked "Lee Smith, language lab." On the back of the notebook paper someone had added several numbers, and one number was the same as the amount on the deposit slip. Smith's father also gave the police a pair of size fourteen shoes that appeared to have blood stains on them and that he had retrieved from the same trash can.

Jack Remus, a Florida Department of Law Enforcement (FDLE) crime lab analyst, testified that the shoes were tested with phenolpthalein to detect blood, and while the test results exhibited some of the chemical indications associated with blood, attempts at DNA testing were not successful. Remus also tested the blood-stained sock and determined that the DNA typing was consistent with the victim. Hurst's pants were also tested, but no blood evidence was detected. FDLE fingerprint expert Paul Norkus testified that the deposit slip in the garbage can had three of Hurst's fingerprints on it.

At trial, the State played the tape of an interview the police had conducted with Hurst shortly after the murder. Hurst said that on the morning of the murder he was on his way to work and his car broke down. He said that he telephoned Harrison at Popeye's to say he was unable to come to work, and when he talked to her, she sounded scared and he heard whispering in the background. Hurst then went to Smith's house and changed out of his work clothes. Hurst said he went to the pawn shop and bought necklaces for friends, but he did not mention purchasing the three rings or buying a new pair of shoes at Wal-Mart.

At the close of the guilt phase of the trial, the jury deliberated for approximately six hours before finding Hurst guilty of first-degree murder.

Hurst, 819 So. 2d at 692-94 (footnotes omitted).

Hurst filed his initial, amended postconviction proceeding in circuit court.[1]

On appeal from denial of postconviction relief, we affirmed on all but one of his

---

1. The claims raised in the initial postconviction motion were: (1) the State withheld material and exculpatory evidence and/or presented misleading and false testimony, i.e., false testimony of inmate witness Anthony Williams that defendant confessed, in exchange for promises of leniency for Williams; suppression of testimony of David Kladitis that three or four black males were in the Popeye's parking lot at 7:00 a.m.; false testimony and argument about defendant failing to mention his trip to Wal-Mart; withholding the fact that the State planned to indict witness Lee ("Lee-Lee") Smith; and cumulative effect of these errors; (2) newly discovered evidence concerning Anthony Williams that his testimony of Hurst's confession was fabricated, newly discovered evidence that jail witness Willie Griffin (Anthony's cousin) testified falsely against defendant, and newly discovered evidence from inmate Edison Sartes that Griffin's testimony was false; new information that primary witness Lee-Lee Smith was going to be and was charged in the case, when at the time of trial he had not been charged; false testimony of witness Carl Hess, who identified defendant based on a false claim of a prior job interview of defendant; and inappropriate conversation at trial between Hess and Kladitis; (3) defense counsel was ineffective in that he failed to adequately investigate and/or present exculpatory and impeachment evidence of potential witness Andrew Salter who was at the crime scene and who would have said he did not see defendant or his car there; failing to secure the testimony of inmate Brett Pleasant regarding his conversations with witness Anthony Williams; failing to object to inadmissible testimony and evidence of defendant's lack of remorse; failing to move for mistrial after an emotional display by the victim's family; failing to object or move for mistrial concerning evidence of physical abnormality of the victim given to create sympathy; and cumulative effect of these errors; (4) counsel failed to adequately investigate and present mitigation in the penalty phase about defendant's childhood, lack of parental support, poverty, physical and mental abuse, drug and alcohol abuse; and counsel's failure to seek a psychiatric evaluation and to present mental mitigation including evidence of neurological and mental deficits and brain damage; (5) defendant may not be executed because he is mentally retarded under Atkins v. Virginia, 536 U.S. 304 (2002); (6) Florida's capital sentencing statute violates the Eighth and Fourteenth Amendments to the United States Constitution and Ring v. Arizona, 536 U.S. 584 (2002); (7) cumulative error unconstitutionally deprived defendant of a fair trial,

- 5 -

postconviction claims.  See Hurst v. State, 18 So. 3d 975 (Fla. 2009).  Although we concluded that the State should have disclosed certain field notes by investigator Donald Nesmith, and that the trial court's refusal to perpetuate the testimony of Willie Griffin was an abuse of discretion, we concluded no prejudice accrued from those errors.  Id. at 1015.  However, we reversed the denial of relief on Hurst's claim of ineffective assistance of counsel in investigation and presentation of mitigation in the penalty phase, and remanded for a new penalty phase proceeding.  Id. at 1008.  In granting a new penalty phase, we explained that there was no sound basis for Hurst's defense counsel to have failed to investigate and present evidence of Hurst's borderline intelligence, possible organic brain damage, the fact that he was in special education classes as a child, and other mitigation for which there appeared to be no apparent disadvantage in presentation.  See id. at 1013-15.

Prior to the new sentencing trial, the trial court denied Hurst's successive motion for an evidentiary hearing on mental retardation.[2]  In addition, the court

---

requiring a new trial.  Not all the claims raised in the postconviction motions were appealed.

2.  The 2013 Legislature amended all Florida statutes that refer to "mental retardation," "retardation," and "mentally retarded" to now refer to "intellectual disability" or "intellectually disabled."  See ch. 2013-162, Laws of Fla.; see, e.g., section 921.137, Florida Statutes (2013), titled "Imposition of the death sentence upon an intellectually disabled defendant prohibited."  Because the prior statute was in effect when Hurst raised the issue in the trial court, we continue to use the terms "mental retardation" and "mentally retarded" in this opinion.

denied Hurst's request to present mental retardation to the penalty phase jury as an absolute bar to recommendation of a death sentence, although the court allowed him to present mental retardation and other mental issues as mitigation to the jury. After the new penalty phase evidence was presented, in which the State presented an abbreviated version of the trial testimony as to the circumstances of the murder, and after the defense presented testimony concerning mitigation, the jury returned a recommendation of death by a seven-to-five vote.

Before sentencing, the trial court held a Spencer[3] hearing at which defense counsel presented further argument that the evidence at the penalty phase established that Hurst was mentally retarded. The trial court subsequently entered a sentencing order sentencing Hurst to death. In doing so, the court found as aggravating factors that (1) the murder was especially heinous, atrocious or cruel, see § 921.141(5)(h), Fla. Stat. (2012), which was assigned great weight; and (2) the murder was committed while Hurst was engaged in commission of a robbery, see § 921.141(5)(d), Fla. Stat. (2012), which was assigned great weight. In mitigation, the trial court found the following two statutory mitigators: (1) no significant history of prior criminal activity, see § 921.141(6)(a), Fla. Stat. (2012), which was assigned moderate weight; and (2) Hurst's age of 19 and his young mental age, see § 921.141(6)(g), Fla. Stat. (2012), which was assigned moderate weight. The trial

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

court found as additional mitigation under section 921.141(6)(h), Florida Statutes (2012), that Hurst had significant mental issues—limited mental and intellectual capacity with widespread abnormalities in his brain affecting impulse control and judgment consistent with fetal alcohol syndrome, which was assigned moderate weight—although the court expressly found that Hurst is not mentally retarded. The trial court rejected as unproven proffered mitigating factors that the defendant was under the influence of mental or emotional disturbance; the defendant was an accomplice with relatively minor participation; the defendant acted under extreme duress or substantial domination of another; or the defendant lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law. See §§ 921.141(6)(b), (d), (e), & (f), Fla. Stat. (2012).

Hurst took a timely appeal from the sentence of death raising the following issues: (1) whether the trial court erred in refusing to give him a separate evidentiary hearing on his successive mental retardation claim, in refusing to allow the jury to determine mental retardation as a bar to execution, and in finding after trial that he is not mentally retarded and exempt from execution; (2) whether this Court should recede from precedent holding that the jury need not expressly find specific aggravators or issue a unanimous advisory verdict on the sentence; and (3) whether his death sentence is proportionate. We turn to Hurst's first issue on appeal.

## ANALYSIS

## A.  Mental Retardation Issues

The United States Supreme Court held in Atkins v. Virginia, 536 U.S. 304 (2002), that the Eighth Amendment to the United States Constitution forbids execution of mentally retarded defendants.  However, the Supreme Court left it to the states to determine the manner in which this constitutional restriction on execution of its sentences will be enforced.  Id. at 317.  Florida law sets forth a three-pronged test to determine mental retardation as a bar to the death penalty.  In order to prove mental retardation as a bar to execution, the defendant must prove all three of the following factors: (1) significantly subaverage general intellectual functioning, which has been interpreted to be a full scale IQ of 70 or below on a standardized intelligence test; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.  See, e.g., Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009); § 921.137(1), Fla. Stat. (2012).  The burden is on the defendant raising a claim of mental retardation as a bar to execution to prove mental retardation by clear and convincing evidence.  See Nixon, 2 So. 3d at 145; § 921.137(4), Fla. Stat. (2012).

Hurst contends that the trial court erred in denying a successive mental retardation hearing pursuant to Florida Rule of Criminal Procedure 3.203.  He contends that he is mentally retarded and exempt from execution based on a recent

Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) test that indicated his full scale IQ is 69, and based on expert testimony that he suffered from adaptive deficits—all before age eighteen—such that he met the statutory requirements for mental retardation. Hurst was previously provided a full evidentiary hearing on the question of mental retardation in his initial postconviction proceeding. At that evidentiary hearing, Hurst presented the expert testimony of Dr. Valerie McClain, a licensed clinical psychologist, who administered a number of tests to Hurst, including the Wechsler Abbreviated Scale of Intelligence (WASI). That test placed Hurst in the borderline range with a full scale IQ score of 70. As to deficits in adaptive functioning, Dr. McClain testified that in her opinion Hurst did not meet the adaptive functioning deficit threshold for mental retardation, and she did not determine that Hurst is mentally retarded. At that same evidentiary hearing, the State presented clinical psychologist Dr. James D. Larsen. After testing Hurst with the WAIS-III test, Dr. Larsen concluded that Hurst's full scale IQ was 78. Dr. Larsen also found no deficits in adaptive functioning necessary for a diagnosis of mental retardation. The circuit court in that initial postconviction proceeding denied the mental retardation claim, relying primarily on the testimony of Dr. McClain and Dr. Larsen that Hurst's adaptive behavior was not substantially impaired; however, no appeal was taken of that ruling when it was denied in 2007. See Hurst, 18 So. 3d at 1008 n.9.

In this case, Hurst contends that the trial court should have held a second Atkins mental retardation hearing prior to the new sentencing trial. The trial court denied the request for a pretrial evidentiary hearing on several grounds, one of which was that the motion was untimely under the requirements of rule 3.203. We conclude that denial of the request for a second Atkins hearing was not an abuse of discretion under the circumstances present in this case. See, e.g., Arbelaez v. State, 898 So. 2d 25, 42-43 (Fla. 2005) (reviewing a trial court's decision not to allow supplemental Ring and Atkins claims on remand under an abuse of discretion standard). Moreover, any error in denying the pretrial evidentiary hearing on mental retardation was harmless because Hurst was allowed to present all his mental retardation evidence at the penalty phase, after which the trial court ruled that he failed to establish that he is mentally retarded. The background and mental mitigation evidence presented by Hurst at the penalty phase is discussed next.

Hurt's sister, Sequester "Tina" Hurst; brother, Jermaine Bradley; mother, Bertha Bradley; father, Timothy Bradley; Bible study teacher, Isaac Sheppard; administrator at Hurst's high school, Calvin Harris; and former United States Army Major and principal of East Charter School, Jerome Chism, all testified concerning Hurst's family and background. Hurst's mother was age fifteen when Hurst was born and, during pregnancy, she drank all day, every day. As a child,

Hurst stuttered and developed very slowly. As a toddler, he was slow to learn to walk. He was disciplined harshly when he was growing up and was punished more than the other children because he could not do things correctly.

Hurst was a fun-loving child and teenager with a good personality. He liked to play jokes and was mild tempered, but was slow mentally and did very poorly in school. In Bible study classes as a child, Hurst was unable to progress out of the most basic children's Bible study book and could not look up the Bible verses that went with the stories. He was embarrassed because he had difficulty reading. Hurst should have been in special education classes because he was low functioning and could not understand what was going on in class; and for that reason, he would skip class and play basketball in the gym. Even though his school wanted to place Hurst in a special education program, his mother objected because she was afraid he would be picked on. He did go to East Charter School, which taught low achievers and children with behavioral problems, and while there, was teased about his large size and his slowness. His maturity level remained very low and even at age eighteen, he exhibited the maturity of a middle-school student. Hurst could not obtain a GED, but did have a driver's license and obtained a car with his father's help, although he was a poor driver.

Family members testified that Hurst had to be reminded to take care of himself; and he allowed his mother and sister to wash his clothes, and allowed his

mother to cook for him. He had poor hygiene and had to be reminded to bathe and dress appropriately. He had to be reminded to keep appointments and be awakened for work. Hurst did not have a checking account and would likely have had difficulty making change if he was working a cash register. However, Hurst was employed at Popeye's and did food "prep work."

Dr. Joseph Wu, a psychiatrist, professor of psychiatry, and clinical director of the University of California at Irvine College of Medicine Brain Imaging Center, testified as an expert on the use of positron emission tomography (PET) in regard to neurological and psychiatric disorders. He was present when a PET scan was performed on Hurst and later interpreted the results of that PET scan. Dr. Wu testified that the scan showed a decreased cortical cerebellum metabolic rate, which indicated widespread damage to the cortical region of Hurst's brain. He opined that Hurst has widespread abnormalities in multiple areas of his brain, which abnormalities are associated with lack of judgment, risk taking, impulsivity, and immaturity. Dr. Wu was aware that it was reported Hurst suffered from fetal alcohol syndrome, which, along with other trauma, can cause the types of problems seen in Hurst's PET scan, although he could not say from the PET scan what caused the abnormalities in Hurst's brain.

Dr. Harry Krop, a clinical and forensic psychologist, testified that he administered the WAIS-IV test, as well as a test of memory malingering (TOMM),

to Hurst in January and February 2012. The testing resulted in a full scale IQ of 69, which is in the range of mental retardation. Dr. Krop reviewed details of the murder, Hurst's regular school records, the charter school records, Florida Department of Corrections records, tests and reports of other testing performed on Hurst, and Dr. Wu's PET scan report. He also spoke to various family members for the purpose of evaluating Hurst's adaptive functioning as measured by completion of the Adaptive Behavior Assessment System (ABAS). He did not listen to the recorded statement Hurst gave to police. After reviewing the questionnaire for the ABAS, which was completed by Hurst and three family members, Dr. Krop concluded that Hurst is significantly deficient in all areas of adaptive functioning. Dr. Krop was aware of earlier testing in which Hurst scored in the 78 IQ range on a different WAIS test, which Dr. Krop opined was not as accurate as the newer WAIS-IV, and his final opinion was that Hurst is mentally retarded.

Dr. Gordon Taub, psychologist and associate professor at the University of Central Florida specializing in measurement of intelligence, structure of intelligence, intelligence theory, and evaluation of intelligence tests, testified that he has written articles about the Wechsler Scale of Intelligence tests. He testified that the WAIS-IV, which was revised in 2008, now measures four areas of intelligence, made changes in the subtests, and added some completely new tests.

Dr. Taub was aware that Hurst received a full scale IQ score of 78 on the earlier WAIS-III test in 2004, which he said tested for only two main factors. He agreed that on the WAIS-IV test, which was given by Dr. Krop and which tests for four main factors, Hurst received a full scale score of 69. Dr. Taub opined that scores on the current WAIS-IV and earlier Wechsler tests cannot properly be compared because of the changes to the newer test and because the WAIS-IV is a much better test. However, Dr. Taub agreed that the WAIS-III is a "valid score of intelligence and there's no reason not to use that score if you attained it at the time that it was the test to use to measure intelligence."

Dr. Taub testified that other testing done on Hurst when he was under the age of eighteen and still in school showed depressed scores. As to Hurst's adaptive functioning, Dr. Taub testified that the information gathered by Dr. Krop showed Hurst was impaired in functioning in the real world in areas of self-care and in communication. Dr. Taub administered the Woodcock Johnson Test of Achievement, Third Edition, to Hurst, which tests areas in reading, writing, math, and spelling. He opined that Hurst's limited proficiency shown on the achievement test is consistent with his school records showing low performance. He concluded based on the WAIS-IV test and on information concerning Hurst's adaptive functioning, school records, and achievement testing, that Hurst meets the legal criteria for mental retardation in Florida.

The State presented the testimony of Dr. Harry McClaren, forensic psychologist, who testified that he reviewed court documents, the testimony of Hurst's family members, the testimony of Drs. McClain and Larson at the prior evidentiary hearing, mental health records from the Department of Corrections, educational records and school test results, information about the crime, Hurst's statement to police, and the testimony of Drs. Taub and Krop. Dr. McClaren also reviewed a WAIS-III test given to Hurst by a Dr. Riebsame in 2003 and the WASI (Wechsler Abbreviated Scale of Intelligence) given by Dr. McClain in 2004. He testified that it would be a mistake to ignore Hurst's past testing with the WAIS-III resulting in full scale IQ scores of 76 and 78 because that test was the state of the art instrument at the time. Dr. McClaren also testified that there was no adaptive behavior testing done when Hurst was young, and now the reports of his deficits are anecdotal. He opined that Hurst does not meet the criteria for mental retardation.

The trial court relied primarily on the testimony of Dr. McClaren and on evidence of Hurst's actions in and around the time of the crime in determining that Hurst did not meet the test for mental retardation as a bar to the death penalty. In addition to testimony of members of law enforcement who investigated the crime and recovered evidence from Lee-Lee Smith's house, the State presented Hurst's statement given to detectives at the time. After Hurst signed a waiver of his rights

and agreed he was speaking voluntarily with the detectives, he gave a narrative of what he said he did that morning in which he described going to a friend's house to unsuccessfully try to use the telephone because, he said, his car broke down. He gave street directions to that friend's house. Hurst said he then went to the E-Z Serve to use the pay telephone to call Popeye's and tell Cynthia Harrison he would not be able to come into work. He said that she spoke "in a scary voice" with a "scary tone," and he could hear some whispering in the background. He recited the telephone number that he called to talk with her. Hurst also related to detectives that he went to Lee-Lee Smith's house that morning, and then to his own house where his brother Jermaine asked Hurst to take him to a pawn shop. Hurst described putting something in his car to clean out the gas tank and then driving to the pawn shop with Jermaine, Lee-Lee, and another young man. Hurst said in his statement that he bought his brother two necklaces at the pawn shop with his brother's money. Hurst told detectives that after leaving Lee-Lee Smith's house and before going to the pawn shop, he changed his shirt and shoes but not his work pants. Timothy Bradley, Hurst's biological father, testified that on the morning of May 2, 1998, at around 7:45 a.m., he saw Hurst putting the battery back into his car after the battery had been on the charger all night. At that time, Hurst was wearing his Popeye's uniform.

The trial court concluded in the sentencing order that Hurst was able to maintain a job and had acquired a driver's license. The court noted that Hurst's statement to police and his efforts to conceal his involvement in the crime were particularly persuasive in determining that Hurst did not suffer significant deficits in adaptive functioning. The court stated, "The statement, given shortly after the crime, reveals an individual clearly recounting a morning's events, giving directions, recalling telephone numbers, and deliberately omitting certain information tending to incriminate him. Similarly, the evidence offered at trial suggests that Defendant took numerous steps to conceal his involvement in the crime by attempting to clean the murder scene, having his clothes washed, hiding the money in another location, discarding Ms. Harrison's belongings and his shoes, and buying new shoes." We also note that evidence that Hurst was a nineteen-year-old who still lived at home and allowed his mother and sister to cook for him and do his laundry does not establish that he is unable to care for himself. Because the trial court had before it competent, substantial evidence to support its conclusion that Hurst is not mentally retarded under the three-prong test set forth in Florida law, we find no error in this ruling.

Although Hurst was allowed to present all his mental retardation and other mental mitigation to the jury, he also contends that the trial court erred in refusing to submit the question of mental retardation as a bar to the death penalty to the jury

- 18 -

for its determination. This claim lacks merit. We have repeatedly held that a defendant has no right under Atkins to a jury determination of whether he is mentally retarded. See Hodges v. State, 55 So. 3d 515, 526 (Fla. 2010) (holding that defendant is not entitled to a jury determination of his mental retardation status), cert. denied, 132 S. Ct. 164 (2011)); Kilgore v. State, 55 So. 3d 487, 510-11 (Fla. 2010) (reiterating that the capital defendant has no right under Atkins to a jury determination whether he is mentally retarded); Rodriguez v. State, 919 So. 2d 1252, 1267 (Fla. 2005) (same). Some states have established procedures under which a jury does determine if a capital defendant is mentally retarded. See, e.g., Commonwealth v. Sanchez, 36 A.3d 24, 60-61 (Pa. 2011) (discussing survey of state law on procedures for determining mental retardation in capital cases). Florida is not one of those states, and the United States Supreme Court has not mandated any specific procedure for making the determination of mental retardation in the capital sentencing context. Thus, the trial court did not err in refusing to submit to the jury the question of Hurst's mental retardation as a bar to the death penalty in this case.

### B.  Lack of Jury Findings as to Specific Aggravators and Lack of a Unanimous Advisory Verdict on the Sentence

Hurst next contends that constitutional error occurred in his case because the advisory jury in the penalty phase was not required to find specific facts as to the

aggravating factors,[4] and that the jury was not required to make a unanimous recommendation as to the sentence. In this case, the jury voted seven to five to recommend a death sentence be imposed. Hurst bases his claims on the United States Supreme Court's decision in Ring, which held that capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment. 536 U.S. at 589. Hurst recognizes that our precedent has repeatedly held that Ring does not require the jury to make specific findings of the aggravators or to make a unanimous jury recommendation as to sentence, and he asks us to revisit our precedent on the issue in the decisions in Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), and King v. Moore, 831 So. 2d 143 (Fla. 2002). In the plurality decisions in both cases, we rejected claims that Ring applied to Florida's capital sentencing scheme. We decline to revisit those decisions in this case.

Hurst contends that the facts of this case support a conclusion that Ring applies to require the jury to expressly find one or more aggravators and to issue its recommendation based on a unanimous advisory verdict. He contends that this case is distinguishable from cases where a jury has unanimously found an aggravating factor such as conviction of a prior violent felony or that the murder

---

4. Hurst's counsel asked for an interrogatory verdict to specify the aggravators found and the votes on each. The motion was denied.

was committed in the course of committing, attempting to commit, or flight after commission of a separate enumerated felony. See § 921.141(5)(b), (d), Fla. Stat. (2012). There is no prior violent felony aggravator in this case, nor did this jury convict Hurst of a contemporaneous felony such as robbery. However, we have rejected the Ring claim in similarly situated cases.

We previously rejected the invitation to revisit our decisions in Bottoson and King in Peterson v. State, 94 So. 3d 514 (Fla.), cert. denied, 133 S. Ct. 793 (2012), a case which also did not involve conviction for a prior violent felony or a contemporaneous enumerated felony, and did not involve a unanimous jury advisory verdict. There, the majority stated, "We have consistently rejected claims that Florida's death penalty statute is unconstitutional." Id. at 538 (citing Baker v. State, 71 So. 3d 802, 823-24 (Fla. 2011), cert. denied, 132 S. Ct. 1639 (2012); Darling v. State, 966 So. 2d 366, 387 (Fla. 2007); Frances v. State, 970 So. 2d 806, 822 (Fla. 2007)). Similarly, in Butler v. State, 842 So. 2d 817, 834 (Fla. 2003), this Court rejected the Ring claim where there was no aggravating factor based on a prior violent felony conviction and there was no unanimous jury advisory sentence. See also Ault v. State, 53 So. 3d 175, 206 (Fla. 2010) ("[T]his Court has repeatedly and continually rejected such claims" that the advisory verdict must be unanimous); Coday v. State, 946 So. 2d 988, 1006 (Fla. 2006) (reiterating that it is

- 21 -

not unconstitutional for a jury to be allowed to recommend death by a simple majority vote). We continue to adhere to this same body of precedent.

We also note that the Eleventh Circuit Court of Appeals in Evans v. Secretary, Fla. Dep't. of Corrections, 699 F.3d 1249 (11th Cir. 2012), cert. denied, Evans v. Crews, 133 S. Ct. 2393 (2013), reversed a federal district court's ruling that Florida's sentencing scheme violates Ring. The Eleventh Circuit noted that the United States Supreme Court's "last word in a Florida capital case on the constitutionality of that state's death sentencing procedures" came in Hildwin v. Florida, 490 U.S. 638 (1989), which predated Ring. Evans, 699 F.3d at 1258. This Court, in Hildwin v. State, rejected the claim that the sentencing scheme was unconstitutional because the jury is not required to make specific findings authorizing the imposition of the death penalty. 531 So. 2d 124, 129 (Fla. 1988). On review, the United States Supreme Court affirmed our decision in Hildwin and stated, "[T]he Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." Hildwin, 490 U.S. at 640-41. As the Eleventh Circuit noted in Evans, the United States Supreme Court has never expressly overruled Hildwin, and did not do so in Ring. The Evans court also agreed with the State that Florida's sentencing procedures do provide for jury input about the existence of aggravating factors prior to sentencing—a process that was completely lacking in the Arizona statute struck

down in <u>Ring</u>.  <u>Evans</u>, 699 F.3d at 1261.  For all these reasons, we reject Hurst's

claim that Florida's capital sentencing scheme is unconstitutional under <u>Ring</u>.

## C.  Proportionality

Hurst next contends that the death sentence in this case is not proportional

because it is not one of the most aggravated and least mitigated of first-degree

murders, thus requiring that his death sentence be reduced to life in prison.  He

contends that a life sentence should be imposed based on evidence of abnormalities

in his brain due to fetal alcohol syndrome, his low mental functioning, and other

mental and background mitigation.  In performing the proportionality review, this

Court has explained:

> "[W]e make a comprehensive analysis in order to determine whether
> the crime falls within the category of both the most aggravated and the
> least mitigated of murders, thereby assuring uniformity in the
> application of the sentence."  We consider the totality of the
> circumstances of the case and compare the case to other capital cases.
> This entails "a <u>qualitative</u> review by this Court of the underlying basis
> for each aggravator and mitigator rather than a quantitative analysis."
> In other words, proportionality review "is not a comparison between
> the number of aggravating and mitigating circumstances."

<u>Williams v. State</u>, 37 So. 3d 187, 205 (Fla. 2010) (quoting <u>Offord v. State</u>, 959 So.

2d 187, 191 (Fla. 2007) (citations omitted)).  This Court has long recognized an

obligation to perform a proportionality review.[5]  See, e.g., Lamadline v. State, 303

So. 2d 17, 20 (Fla. 1974).

In reviewing proportionality, this Court follows precedent that requires that

the death penalty be "reserved only for those cases where the most aggravating and

least mitigating circumstances exist."  Terry v. State, 668 So. 2d 954, 965 (Fla.

1996).  In doing so, we "will not disturb the sentencing judge's determination as to

'the relative weight to give to each established mitigator' where that ruling is

'supported by competent, substantial evidence in the record.' "  Blackwood v.

State, 777 So. 2d 399, 412-13 (Fla. 2000) (quoting Spencer v. State, 691 So. 2d

1062, 1064 (Fla. 1996)).  We "review the weight the trial court ascribes to

mitigating factors under the abuse of discretion standard."  Smith v. State, 998 So.

2d 516, 527 (Fla. 2008).  The Court will also "affirm the weight given an

aggravator if based on competent substantial evidence."  Blake v. State, 972 So. 2d

839, 846 (Fla. 2007).  "The weight to be given aggravating factors is within the

discretion of the trial court, and it is subject to the abuse of discretion standard."

Buzia v. State, 926 So. 2d 1203, 1216 (Fla. 2006).

Hurst contends, inter alia, that his case is similar to Cooper v. State, 739 So.

2d 82, 86 (Fla. 1999), in which the Court vacated the death sentence and imposed a

---

5.  Rule 9.142 (a)(5), Florida Rule of Appellate Procedure, provides that "[i]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."

life sentence on the basis of lack of proportionality when compared to other capital cases. In Cooper, the evidence showed the defendant was eighteen years old at the time of the crime. Cooper also suffered from borderline mental retardation, brain damage likely caused by beatings and head trauma as a child, a history of seizures, schizophrenia, cognitive brain impairment, and an abusive childhood including being repeatedly threatened with a gun by his father. The trial court in Cooper found three aggravators and two statutory mitigators, as well as other nonstatutory mitigation. We conclude that although there was more aggravation in Cooper, there was also more mitigation than is present in this case. Cooper does not require us to find Hurst's sentence disproportionate.

The State relies on Jeffries v. State, 797 So. 2d 573 (Fla. 2001), as a basis on which to find the sentence in this case proportional. In Jeffries, the murder occurred in a somewhat similar manner to the instant case—the victim was stabbed, suffering multiple sharp force injuries, and was beaten. Id. at 575. The trial court found two aggravators, murder in course of commission of a robbery and HAC. Id. at 576. The mitigation included findings that the defendant's capacity to appreciate the criminality of his conduct was impaired, that the codefendant was equally culpable and received a plea deal for a twenty-year sentence, and that Jeffries had a long history of emotional and mental problems, as

well as drug and alcohol abuse.  We held that the death sentence in <u>Jeffries</u> was proportional when compared to other capital cases.  <u>Id.</u> at 583.

More recently, in <u>Allen v. State</u>, 38 Fla. L. Weekly S592 (Fla. Jul. 11, 2013), we found the death sentence proportionate.  The victim was bound and had chemicals poured on her face.  Allen beat the victim with belts, put a belt around her neck and, in spite of her pleas to stop, strangled her.  The autopsy also revealed facial bruising, bruising on the torso, hand, thigh, knee, and shoulder; and the victim had contusions on her hands, face, and torso.  Her hands showed ligature marks from having been tied, and her neck showed signs of ligature.  <u>Id.</u> at S593.

The trial court in <u>Allen</u> found two aggravators—commission of the murder in the course of committing or attempting to commit a kidnapping, and that the murder was especially heinous, atrocious, or cruel.  <u>Id.</u> at S594.  The nonstatutory mitigation found by the court included that Allen had been the victim of physical and possibly sexual abuse, had brain damage due to numerous prior head injuries resulting in lack of impulse control, suffered a poor childhood environment, and exhibited helpfulness.  The evidence also showed that Allen had significant organic brain damage and intracranial injuries, and was at the lower end of intellectual capacity.  Testimony was received that a PET scan revealed at least ten brain injuries, mostly to the right side of Allen's brain which would affect impulse control, judgment, and mood, and would make it hard for her to conform her

conduct to the requirements of society. We found the death sentence in <u>Allen</u> proportionate when compared to sentences in other capital cases. <u>Id.</u> at S600.

Similarly, in <u>Rogers v. State</u>, 783 So. 2d 980 (Fla. 2001), the victim was murdered by being brutally stabbed, and had bruises, abrasions, and a shallow defensive wound to her arm. <u>Id.</u> at 986. The trial court found two aggravators—that the murder was committed for pecuniary gain and that it was especially heinous, atrocious, or cruel. <u>Id.</u> at 987. The court found one statutory mitigator—that the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. <u>Id.</u> This last mitigating factor was based on the trial court's finding that Rogers suffers from psychosis and brain damage that may have been exacerbated by long-term alcohol abuse. <u>Id.</u> at 996. The trial court found other mitigation in Rogers' difficult family background, abusive childhood, and his exhibition of good qualities as a father and employee. <u>Id.</u> We upheld the death sentence in <u>Rogers</u> as proportionate.

Based on the forgoing, we find that Hurst's death sentence, when compared to the death sentences in other comparable capital cases, is proportionate.

## CONCLUSION

For the reasons expressed above, we affirm Hurst's sentence of death for the first-degree murder of Cynthia Harrison.

It is so ordered.

POLSTON, C.J., and LEWIS, QUINCE, and CANADY, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which
LABARGA and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.


PARIENTE, J., concurring in part and dissenting in part.

I concur in the majority's conclusion that the trial court did not abuse its

discretion in denying Hurst a successive mental retardation hearing pursuant to

Florida Rule of Criminal Procedure 3.203 prior to the new sentencing proceeding.

I dissent, however, from the majority's affirmance of Hurst's sentence of death

because there was no unanimous jury finding of either of the two aggravating

circumstances found by the trial judge—that the murder was heinous, atrocious, or

cruel; and that the murder was committed in the course of a robbery.

No jury ever convicted Hurst of the contemporaneous robbery, so this case

does not fall within the exception to the constitutional requirement of juror

unanimity for a contemporaneous felony conviction or a prior violent felony

conviction as an aggravating circumstance, which automatically demonstrate that

the jury has made the necessary findings to warrant the possibility of a death

sentence. See Johnson v. State, 969 So. 2d 938, 961 (Fla. 2007) (rejecting a

challenge to the constitutionality of the defendant's death sentence because the

"murder in the course of a felony aggravator" was premised on separate convictions, "which satisfies Sixth Amendment requirements").

In Hurst's case, the jury recommended death by the slimmest margin permitted under Florida law—a bare majority seven-to-five vote. Because a penalty-phase jury in Florida is not required to make specific factual findings as to the aggravating circumstances necessary to impose the death penalty pursuant to Florida's capital sentencing statute, it is actually possible that there was not even a majority of jurors who agreed that the same aggravator applied. See Peterson v. State, 94 So. 3d 514, 540 (Fla. 2012) (Pariente, J., concurring as to conviction and dissenting as to sentence). In my view, Hurst's death sentence cannot be constitutionally imposed, consistent with the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), and Florida's right to trial by jury, in the absence of a unanimous finding by the jury that any of the applicable aggravators apply, which is not present here.

I have previously expressed my view that "[t]he absence of a requirement of a unanimous jury finding as a precondition to a sentence of death is . . . a matter of constitutional significance." Butler v. State, 842 So. 2d 817, 838 (Fla. 2003) (Pariente, J., concurring in part and dissenting in part). Indeed, I continue to believe that, in light of Ring, Florida's death penalty statute, as applied in circumstances like those presented in this case where there is no unanimous jury

finding as to any of the aggravating circumstances, is unconstitutional. <u>See</u> <u>Peterson</u>, 94 So. 3d at 538 (Pariente, J., concurring as to conviction and dissenting as to sentence).

As I stated in my opinion dissenting as to the affirmance of the death sentence in <u>Peterson</u>:

> Under our current sentencing scheme, not all defendants who are convicted of first-degree murder are eligible for a sentence of death. The trial judge must make additional findings before the death penalty can be imposed. <u>See generally</u> § 775.082, Fla. Stat. (2011). Without these findings, a trial court cannot impose a higher sentence than life imprisonment on the basis of the verdict alone. <u>See</u> § 775.082(1), Fla. Stat. (stating that without findings by the court that a defendant "shall be punished by death, . . . such person shall be punished by life imprisonment"). It is only after a sentencing hearing and additional findings of fact regarding aggravators and mitigators that the sentence of death may be imposed. Not only is this requirement imposed by Florida law, but it is constitutionally mandated by the Eighth Amendment to prevent death sentences from being arbitrarily imposed.
>
> In addition, as interpreted by the United States Supreme Court in <u>Ring</u>, the Sixth Amendment requires that a jury find those aggravating factors. As Justice Scalia explained in his concurring opinion in <u>Ring</u>, the bottom line is that "the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by a jury." <u>Ring</u>, 536 U.S. at 610 (Scalia, J., concurring).

<u>Id.</u> at 538-39.

"Apart from capital sentencing, the requirement of unanimity has been scrupulously honored in the criminal law of this state for any finding of guilt and

for any fact that increases the maximum punishment." Butler, 842 So. 2d at 837 (Pariente, J., concurring in part and dissenting in part). "Florida's exclusion of the death penalty from the requirement of jury unanimity cannot be reconciled" with the Supreme Court's holdings in Ring that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death," and that "the Sixth Amendment applies to both." Peterson, 94 So. 3d at 539 (Pariente, J., concurring as to conviction and dissenting as to sentence) (quoting Ring, 536 U.S. at 609) (emphasis omitted).

It remains my view that Ring requires any fact that qualifies a capital defendant for a sentence of death to be found by a jury, and that Florida's state constitutional right to trial by jury, which is embodied in article I, section 22, of the Florida Constitution, "requires a unanimous jury finding beyond a reasonable doubt on the existence of any element necessary to increase an authorized punishment, most especially the ultimate punishment of the death penalty." Butler, 842 So. 2d at 838 (Pariente, J., concurring in part and dissenting in part); see also Coday v. State, 946 So. 2d 988, 1022 (Fla. 2006) (Pariente, J., concurring in part and dissenting in part). In other words, article I, section 22, is violated in the rare case where the death penalty is imposed without any of the aggravators that automatically demonstrate that a jury has made the necessary findings to warrant

the possibility of a death sentence, such as a prior violent felony conviction or that the murder occurred while in the course of an enumerated felony that was also found by a jury. This is one of those rare cases.

This case also illustrates how the use of a special verdict form would help solve the problem, as Hurst's counsel requested an interrogatory verdict to specify the aggravators found by the jury and the votes on each, but the motion was denied in accordance with this Court's case law preventing the use of penalty-phase special verdict forms detailing the jurors' determination concerning aggravating factors. See State v. Steele, 921 So. 2d 538, 545 (Fla. 2005). Had the jury been permitted to specify its findings, it is possible that this Court would have evidence in the record that Hurst's jury unanimously found the existence of one of the aggravators found by the trial judge in imposing the death sentence, thereby curing the constitutional infirmity in this case. Because the jury was not permitted to indicate its findings, however, this evidence does not appear in our record.

I have previously expressed my view as to the "difficulties created" by this Court's decisions that fail to allow or mandate the use of special interrogatories in death penalty cases to permit the jury to make special findings as to the aggravators. Aguirre-Jarquin v. State, 9 So. 3d 593, 610 (Fla. 2009) (Pariente, J., specially concurring). I once again renew this position here, as the use of a special verdict form during the penalty phase would enable this Court "to tell when a jury

has unanimously found a death-qualifying aggravating circumstance, which would both facilitate our proportionality review and satisfy the constitutional guarantee of trial by jury even when the recommendation of death is less than unanimous." Coday, 946 So. 2d at 1024 (Pariente, J., concurring in part and dissenting in part).

Finally, I also take this opportunity to note an evolving concern as to the possible Eighth Amendment implications of Florida's outlier status, among those decreasing number of states that still retain the death penalty, on the issue of jury unanimity in death penalty cases.[6] Except for Florida, every state that imposes the death penalty, as well as the federal system, requires a unanimous jury verdict as to the finding of an aggravating circumstance.[7] This means that in <u>no other state or federal court in the country</u> would Hurst have been sentenced to death in this case

---

6. Since <u>Ring</u> was decided in 2002, six states— Connecticut, Illinois, Maryland, New Jersey, New Mexico, and New York—have abolished the death penalty.

7. In <u>Steele</u>, 921 So. 2d at 548-49, this Court explained that, aside from Florida, only Utah and Virginia did not at that time require a unanimous jury finding of aggravators. Subsequent state supreme court decisions in those two states have concluded that a unanimous jury finding of an aggravating circumstance is required. See <u>Prieto v. Commonwealth</u>, 682 S.E.2d 910, 935 (Va. 2009) ("[W]e hold that in the penalty phase of capital murder trials the death penalty may not be imposed unless the jury unanimously finds either one or both of the aggravating factors of 'vileness' or 'future dangerousness' beyond a reasonable doubt."); <u>Archuleta v. Galetka</u>, 267 P.3d 232, 259 (Utah 2011) ("In Utah, the fact finder in the guilt phase must find—unanimously and beyond a reasonable doubt—the statutory aggravator that makes death a possible sentence.").

- 33 -

in the absence of a unanimous jury finding of an aggravating circumstance. Florida is a clear outlier.[8]

In Steele, 921 So. 2d at 548-49, this Court urged the Legislature to reexamine Florida's capital sentencing statute in light of Ring and Florida's outlier status. I have also previously echoed this suggestion, encouraging the Legislature to bring Florida "closer to the mainstream of capital sentencing states in regard to jury findings." Coday, 946 So. 2d at 1025 (Pariente, J., concurring in part and dissenting in part).

Although those calls for legislative action have arisen primarily due to Ring and Sixth Amendment concerns, the Eighth Amendment ramifications of Florida's outlier status are also clear. For example, two Justices on the United States Supreme Court have recently expressed "deep concerns" about the federal constitutionality of Alabama's death penalty statute in light of its outlier status on the issue of jury overrides. See Woodward v. Alabama, 134 S. Ct. 405, 405 (2013) (Sotomayor, J., with whom Justice Breyer joins as to Parts I and II, dissenting from denial of certiorari).

---

8. In addition to Florida's outlier status as the only state in the country that allows the death penalty to be imposed without a unanimous jury finding of an aggravating circumstance, Florida is also one of the only states to permit the jury to recommend death by a less than unanimous vote.

The United States Supreme Court has repeatedly explained that "death is different" from every other form of punishment. See, e.g., Ring, 536 U.S. at 605-06; Harmelin v. Michigan, 501 U.S. 957, 994 (1991); Gardner v. Florida, 430 U.S. 349, 357 (1977). The Supreme Court has also emphasized the "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case." Sumner v. Shuman, 483 U.S. 66, 72 (1987). As this Court has pointed out, "[m]any courts and scholars have recognized the value of unanimous verdicts," particularly given that the "reliability" of death sentences "depends on adhering to guided procedures that promote a reasoned judgment by the trier of fact." Steele, 921 So. 2d at 549 (quoting State v. Daniels, 542 A.2d 306, 315 (Conn. 1988)).

While questions of public policy regarding Florida's capital sentencing statute are left to the Legislature, the Sixth and Eighth Amendment implications of Florida's outlier status on the lack of jury unanimity, which threaten to unravel our entire death penalty scheme, should be of serious concern. I once again urge the Legislature, as has former Justice Cantero, to revisit this issue in Florida's capital sentencing scheme.

For all these reasons, I dissent from the majority's affirmance of Hurst's death sentence because there is no unanimous finding by the jury that any of the applicable aggravators apply. The absence of juror unanimity in the fact-finding

necessary to impose the death penalty remains, in my view, an independent

violation of Florida's constitutional right to trial by jury.

LABARGA and PERRY, JJ., concur.


An Appeal from the Circuit Court in and for Escambia County,
    Linda Lee Nobles, Judge - Case No. 1998-CF-001795-A

Nancy Ann Daniels, Public Defender, and David A. Davis and William Carl
McLain, Assistant Public Defenders, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Stephen Richard White, Assistant
Attorney General, Tallahassee, Florida,

    for Appellee